[No. S004724. Crim. No. 25693. Dec. 31, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
RODNEY JAMES ALCALA, Defendant and Appellant.

**COUNSEL**

Marshall Warren Krause and Joseph Baxter, under appointments by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and Daniel Lungren, Attorneys General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Harley D. Mayfield, Assistant Attorney General, Michael D. Wellington, Robert M. Foster and Louis R. Hanoian, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, J.**—This case reaches us again after a retrial following this court's reversal of defendant's convictions. At the initial trial in 1980, a jury found defendant Rodney James Alcala guilty of first degree murder, with a kidnapping-murder special circumstance, and other related offenses. Following the jury's penalty-phase verdict, defendant was sentenced to death. In reversing defendant's convictions, this court concluded that the trial court committed prejudicial error at the guilt phase of the trial by admitting evidence of defendant's prior offenses. (*People* v. *Alcala* (1984) 36 Cal.3d

604, 629-636 [205 Cal.Rptr. 775, 685 P.2d 1126] [hereafter *Alcala I*].) This court rejected defendant's contention that retrial was barred by the double jeopardy clause (*id.*, at p. 614), holding that defendant could be retried on all counts.

At the ensuing retrial in 1986, the jury found defendant guilty of one count of first degree murder (Pen. Code, §§ 187, 189),[1] one count of kidnapping (§ 207), one count of false imprisonment (§ 236), and one count of use of a deadly weapon (a knife) (§ 12022, subd. (b)). The jury also found true the special circumstance of murder in the course of a kidnapping (§ 190.2, subd. (a)(17)(ii)). Defendant admitted an alleged prior felony conviction for lewd and lascivious conduct upon a child under the age of 14 years. (§§ 288, 667.) At the penalty phase, the jury fixed the penalty at death, and thereafter the court imposed a sentence of death.[2]

The case is before us again on automatic appeal. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) For the reasons that follow, we conclude that the judgment should be affirmed in its entirety.

FACTS

I. GUILT PHASE EVIDENCE

A. *The prosecution's case*

1. *Overview*

We begin with a brief summary of the prosecution's case, and then set forth a more detailed chronological account of the facts established by the evidence introduced in the prosecution's case-in-chief.

Approximately 3:10 p.m. on June 20, 1979, 12-year-old Robin Samsoe left the Huntington Beach apartment of her friend, Bridget Wilvert, also aged 12, to bicycle to a ballet lesson. Robin did not arrive at her ballet lesson and never again was seen alive by her family or friends. Five days later, on June 25, 1979, Dana Crappa, a forest service employee, discovered Robin's mutilated body more than 40 miles away, in a remote mountain ravine above Sierra Madre.

Crappa told no one of her discovery, however, and it was not until one week later, July 2, 1979, that another person, her colleague William Poepke,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The court also imposed a consecutive nine-year determinate sentence based upon (1) the kidnapping conviction, (2) the use-of-a-knife allegation, and (3) the prior felony conviction.

encountered Robin's remains. Poepke notified the police, who had learned that midafternoon on the day of Robin's disappearance, she and Bridget had been sitting on the cliffs above the beach in Huntington Beach. While there, they were approached by a man who stated he was taking photographs for a school contest. He asked whether he could photograph the girls. They agreed and posed for him. Jackelyn Young, an adult neighbor of Bridget, noticed the girls on the cliffs and walked toward them to investigate. Her approach startled the man taking the photographs. He departed quickly, more than once looking over his shoulder. Young later identified the man as defendant.

Young escorted Robin and Bridget to Bridget's apartment building and continued home. At the apartment, Robin asked Bridget whether she could borrow Bridget's bicycle in order to reach the dance studio on time. Robin left on the bicycle, but never reached the studio.

A police search for Robin commenced that evening. Bridget assisted a police artist in developing a composite drawing of the man who had photographed her and Robin. The drawing appeared in several Southern California newspapers, and was broadcast on television news shows.

The police investigation led officers to obtain warrants to arrest defendant and search his residence and his automobile.[3] On July 24, 1979, the police arrested defendant at his home in Monterey Park and conducted a residential search. During the search of defendant's home, the police found a Seattle, Washington, storage locker receipt which was dated subsequent to the day of Robin's disappearance. After obtaining additional warrants, law enforcement officials searched the locker. Among the items found were photographs of another girl, Lorraine Werts, taken at Sunset Beach the day Robin disappeared, and gold ball earrings that Robin's mother identified as ones she had seen Robin wearing.

Having described the broad outline of the prosecution's case, we now review, in chronological sequence, the prosecution's evidence of the events preceding and following Robin's disappearance and murder.

---

[3]The affidavit in support of the search warrant stated that defendant's former parole officer, as well as another parole officer, had informed Huntington Beach Police Department detectives that the composite sketch resembled defendant. The affidavit also set forth defendant's record as a child molester, his interest in the prurient photography of children, and indications that he frequented the Sierra Madre area.

## 2. *Defendant's activities at the beach, June 19-20, 1979*

Fifteen-year-old Toni Esparza and fourteen-year-old Joanne Murchland spent much of June 19, 1979, on the beach near the Huntington Beach pier. A man they identified at trial as defendant approached the girls in a nearby parking lot, inquiring whether he could take their photographs. He told them he was entered in a "bikini of the month" photography contest. Both girls were wearing bikinis. The girls agreed, and defendant appeared to take five to ten photographs. Defendant said he had some "joints," and asked the girls whether they would like to go for a ride to get "loaded" as payment for posing for him. When the girls declined defendant's offer, he requested their telephone numbers in case he won the contest. The girls refused to give defendant their phone numbers and quickly walked away.

Teenagers Lorraine Werts and Patty Elmendorf went rollerskating at Sunset Beach, a few miles north of Huntington Beach, on the following day, June 20. A man asked them to stop so that he could take some photographs for a class contest. Patty refused. Lorraine, clad in a new bikini, allowed him to photograph her. Patty subsequently identified the man as defendant.

Richard Sillett, a City of Huntington Beach survey-party chief, told police officers that in the early to midafternoon of June 20, while he was on the beach below the cliffs, studying the alignment of a bicycle trail, he observed a man walking down the incline toward the ocean. Sillett, an amateur photographer who owned several cameras, habitually noticed the cameras used by others, and observed that the man carried a 35-millimeter camera with a telephoto lens. The two briefly made eye contact. Sillett later informed the authorities that the composite sketch closely resembled the man with the camera and, both at a photo lineup and at trial, identified defendant as the man he had observed at the beach.

Robin Samsoe and Bridget Wilvert arrived at Bridget's residence approximately 3:10 p.m., after posing for three photographs on the cliffs above the beach. Robin was anxious to reach the dance studio on time and was excited because she would be advancing to toe shoes that day. Bridget allowed Robin to borrow her bicycle, a yellow Schwinn 10-speed boy's bike with the handlebars turned up.

Robin was expected at Beverly Fleming's dance studio by 4 p.m. to answer the telephones; Robin's ballet class at the studio began one hour later. Robin never arrived at the studio. Approximately 5:15 p.m., Fleming telephoned Robin's home in an unsuccessful effort to locate her.

### 3. *Defendant's activities in the mountains, June 20-21, 1979, and subsequent observations by forestry service personnel*

In June 1979, Dana Crappa, 20 years of age, was employed as a seasonal firefighter for the United States Forestry Service, stationed at Chantry Flats.[4] While driving back to the Chantry Flats barracks in the late afternoon of June 20, Crappa noticed a blue Datsun F10 automobile parked on the uphill side of a sharp turnout at mile marker 11 on Santa Anita Canyon Road. She subsequently identified this vehicle as one later determined to be registered to defendant. A few feet in front of the automobile, a medium-built man with dark brown hair was "forcefully steering" or "pushing" a young girl with long blond hair, like Robin's, toward a dry stream bed. The man looked at Crappa as she slowly drove around the curve. Crappa testified the man resembled defendant, but she was "not 100% positive." The sight of the man and the girl appeared odd to Crappa, but she proceeded to the barracks without stopping.

On June 21, in the early evening, Crappa again was driving back to the barracks. At Rendezvous Turnout, approximately 1.6 miles from mile marker 11, she swerved her vehicle to avoid being hit by an automobile coming down the mountain. As she swerved, Crappa's vehicle nearly struck a blue Datsun F10 parked at the side of the road; it was the same vehicle she had observed the previous afternoon.[5] The rear tires and rear portion of the vehicle appeared to have had dirt "kicked up" on them. As she drove by, she glimpsed a dark-haired man near the blue Datsun F10, leaning against a rock

---

[4]The evidence relating to Dana Crappa was adduced from her testimony at defendant's first trial. We address below the propriety of the trial court's admission of Crappa's prior testimony. (See *post*, pp. 774-785.)

Certain facts regarding Crappa's background merit recitation in light of the legal issues raised concerning the admissibility of her testimony. By the time of defendant's first trial, Crappa had obtained permanent employment as a "firefighter emergency medical technician" for the Lake Arrowhead Fire Department, a position which required applicants to pass written, oral, and physical-agility examinations. Crappa testified she had received the highest combined score in her group of applicants and was the only female firefighter in the department. Similarly, she had been the only female firefighter employed by the United States Forestry Service at Chantry Flats in June 1979. At that time, Crappa was pursuing a college degree in fire science and had maintained a 4.0 ("A") grade-point average.

Crappa sustained a debilitating knee injury at Lake Arrowhead in December 1980 which necessitated several surgeries and, at the time of defendant's second trial in 1986, required her to walk with a cane. Her injury prevented her from performing firefighting work, so Crappa attended nursing school, passing her nursing boards and becoming a registered nurse. At the time of defendant's second trial, she was studying to obtain a bachelor's degree to complete her nursing education.

[5]Crappa testified she had considered purchasing a Datsun F10 prior to the above described encounters, and therefore was familiar with that particular model. In describing the blue Datsun F10 she observed on June 20 and June 21, Crappa recalled the chrome luggage rack, tinted windows, "stock" hub caps, and condition of the paint finish. She noted that "F10's

wall. The man wore pants that may have had dirt on them, and a white T-shirt that "appeared to be sort of dirty or have a stain on it." Crappa believed something was wrong when she saw the same vehicle in such a remote area two weekdays in a row.

On June 25, approximately 7 p.m., Crappa parked her vehicle at the mile marker 11 turnout, left the engine running, and walked up a path. The area was permeated by a foul smell. Crappa came upon a tennis shoe, a pair of shorts, and a T-shirt. She also saw a body, bloated and unclothed, missing part of its head, and missing its hands and feet. The torso was "pretty cut up." Terrified, Crappa ran back to her vehicle and drove to her parents' house. Consumed by a sense of guilt, she believed that had she stopped to investigate on June 20 when she observed the man pushing the girl, perhaps the girl would not have been killed. She therefore refrained from telling anyone, including the police, about what she had discovered on June 25. The first time she revealed her observations of June 25 to anyone was when the information was elicited from her during her testimony at defendant's first trial, after she testified concerning her observations of June 20 and 21.[6]

On June 29, a forestry service crew that included Crappa and Poepke was spraying fire retardant near mile marker 11. About 100 feet from the road, Poepke found what he thought was a deer bone which, in jest, he tossed toward Crappa. Crappa was not amused; she knew the bone was human.

That night, approximately 7 p.m., Crappa returned to the area again, apparently to confirm that the remains Poepke had thrown were the human remains she had seen. They were. Crappa saw a small skeleton, missing one arm. Near the skeleton were six .22-caliber shells, which Crappa placed in her pocket and threw away. Because shotgun shells commonly were found in the area, along with broken clay pigeons, she believed the shells had nothing to do with the body of the little girl. Crappa also saw the tennis shoe, shorts, and T-shirt in a pile together. She did not touch them.

On July 2, the forestry service crew returned to mile marker 11 to continue spraying fire retardant. Poepke and two other fire crew members discovered a human skull and some bones. Law enforcement officers were summoned, and the scattered remains later were identified as Robin's.

---

don't come stock with a roof rack or with the black[,] tinted[-]out windows, and I have yet to see another car that resembled that particular one."

[6]Crappa testified: "I knew what I had done was wrong. . . . I should have went back or stopped the afternoon of the 20th or I should have said something to somebody. . . . I couldn't justify what I had done. . . . I began having nightmares. I'd wake up [at] night completely startled in a cold sweat, unable to go back to sleep. . . . I just woke up about as terrified at night as I did earlier when I was actually there [on June 25]. . . . I tried to second guess myself as to if I would have stopped, what would have happened."

### 4. *Crime scene evidence*

Robin's skull had separated from her body. Her lower teeth were fractured in a manner consistent with a traumatic blow to the mouth. Because her remains were found in an advanced state of decomposition, with several of her bones showing signs of having been gnawed by animals, the cause of her death could not be determined from her skeletal remains. Nor could it be determined whether Robin had been sexually molested. No clothing was found, save for the single tennis shoe that bore her name.

Law enforcement officers recovered a Kane Kut kitchen carving knife a few feet from Robin's remains. The knife bore a small film of human blood, which was insufficient for further analysis. Officers gathered bloodstained leaves, rocks, and soil from the immediate area; subsequent analysis revealed the blood to be of a type consistent with the type indicated by bone marrow extracted from Robin's remains. Approximately one mile away, officers found Robin's beach towel, also stained with blood consistent with the type indicated by Robin's bone marrow. The stains also were consistent with someone having taken a bloody, straight-edged instrument and wiping it on the towel. The towel was found crumpled up in a ball.

### 5. *Defendant's conduct, June 20-July 24, 1979*

Defendant spoke by telephone with his girlfriend, Elizabeth Kelleher, on June 20 at 9:41 p.m., and on June 21, at 10:08 p.m. On June 22, defendant visited Kelleher's home in Long Beach; at the time, his hair was long and curly. On June 23, he straightened his hair with the aid of a product that he purchased at a store. On June 26, he cut his hair. On July 8, he told Kelleher he had decided to leave Southern California for Dallas, Texas, where he planned to set up a photography business. Kelleher accompanied defendant to the Monterey Park residence he shared with his mother, Anna Maria German, to help him pack for the trip.

On July 11, defendant rented a storage locker in Seattle, Washington. When he returned to California three days later, he did not tell anyone where he had been, instead informing Kelleher that he had been to Dallas. On July 23, defendant told her he was leaving for Dallas the following day. Defendant told another acquaintance, Leslie Schneider, he was leaving for Chicago.

### 6. *Arrest of defendant and search for evidence*

Police officers arrested defendant at his home a day later, July 24, impounded his automobile, and searched the premises pursuant to a search

warrant. During the course of the search, the officers observed a receipt for a storage locker located in Seattle, Washington. One of the officers copied down the information on the receipt but did not seize it. Officers returned the next day to retrieve the receipt. It was gone.[7] Officers seized full sets of Kane Kut knives. Inside defendant's Datsun F10, the police found a brief-case containing camera equipment and keys.

Officers went to Seattle and obtained a warrant to search the storage locker. The locker was secured with two padlocks, which the officers opened with the keys seized from the briefcase found in defendant's vehicle. The locker contained boxes of photographic material, including slide photo-graphs of Lorraine Werts taken at the beach. The locker also contained jewelry, including a pair of small, gold ball earrings which Robin's mother testified matched a set that had belonged to her and that Robin often wore. Robin's mother said she had looked for the earrings after Robin's disappear-ance, but never had found them. She further testified she had used nail clippers to trim the earrings; a prosecution expert testified that the earrings seized from the locker contained a pattern of striations similar to those produced by the nail clippers that belonged to Robin's mother.

### 7. Inmate testimony

In 1979, defendant and Frederick Williams were inmates at the Orange County jail. Williams had a long history of providing reliable information to law enforcement personnel. Early in 1981, after defendant's initial trial, when Williams was not in custody, he contacted Susanne Shaw, who was employed as an Orange County Deputy District Attorney. He told Shaw he had some information regarding defendant's case.

At the time of defendant's second trial, Williams was back in custody, but was scheduled for release a few weeks hence. Williams, stating he had neither sought nor received any consideration for his testimony, testified defendant told him in 1979 that defendant regretted having spoken with inmate Ricky Rodriguez, who had given damaging pretrial testimony against defendant. Later, defendant showed Williams a photograph of his girlfriend and "made a comment about the young lady that was supposedly involved in his case, Robin, and said [the girlfriend] was nothing like Robin when he was with Robin. She was—scratching, yelling and acting like a little wild cat, and had a butt like a grapefruit." Williams testified defendant told him that he first noticed Robin at the beach area in Huntington Beach.

---

[7]Defendant's sister, Marie Christine De La Cerda, testified that on July 25, 1979, she spoke with her brother at the jail. She said that after he inquired whether the police had found the storage-locker receipt, she entered defendant's residence, searched her brother's room for the receipt, retrieved it, and gave it to her mother, Anna Maria German. De La Cerda believed the receipt thereafter was lost.

Williams also described a jailhouse incident that took place during the course of defendant's first trial. He testified that defendant, in recalling a demonstration for the jury of how defendant might have placed Robin's bicycle inside his automobile, "was sort of laughing to himself, making fun of the jury as if they were not too competent." According to Williams, defendant said "they were all acting like a bunch of ducks trying to get the bike in the car and wasn't doing too good of a job of it." Williams testified defendant told him that when he placed Robin's bicycle inside the vehicle, he "just threw it in there like a snap."

B. *The defense case*

1. *Alibi*

Defendant presented an alibi defense, attempting to establish that he was at Knott's Berry Farm in Buena Park during the early to midafternoon of Robin's disappearance, seeking employment as a photographer for a disco dance contest to be held at the park. Defendant did not testify in his own behalf, but several employees of Knott's Berry Farm testified that they remembered seeing defendant at the park near the date of Robin's disappearance, although none could testify specifically to having seen him there on June 20.

Defendant's sister, Marie Christine De La Cerda, testified she saw defendant at her home in Monterey Park between 4:00 and 4:30 p.m. on June 20. (De La Cerda's testimony subsequently was contradicted by that of a prosecution rebuttal witness, Sergeant Edward McErlain of the Huntington Beach Police Department. McErlain testified he had interviewed De La Cerda the day of defendant's arrest, July 24, when she stated she did not recall seeing defendant on June 20.) On cross-examination, De La Cerda confirmed that on July 24, after checking her calendar during the interview with McErlain, she told him she could not recall seeing defendant on June 20. She also acknowledged visiting her brother in jail on July 25, prior to another interview that she had with McErlain later that day. De La Cerda testified that during this second interview, she told McErlain she had seen her brother at her house approximately 4:00 p.m. on June 20. An acquaintance of De La Cerda, Richard Mason, testified on rebuttal that he was at her home on June 20 until 4:30 or 5:00 p.m. and never saw defendant that day.

Defendant's other sister, Marie Therese Troiano, testified that defendant had telephoned her from his home in Monterey Park at 5:54 p.m. on June 20. On cross-examination, after reviewing defendant's telephone bill for June 1979, she acknowledged that the telephone call in question was the only one

she could remember from that month. Defendant's mother, Anna Maria German, denied making the call. (On rebuttal, McErlain testified that on July 25, 1979, he reviewed the telephone bill with German, who told him she had made the telephone call to Troiano on June 20 at 5:54 p.m.)

### 2. *Changed appearance*

Defendant sought to prove his changed appearance was unrelated to Robin's murder. The defense presented evidence that prior to June 20, Kelleher had encouraged defendant to change his hairstyle. On cross-examination, however, Kelleher admitted that defendant did not act on her wishes until June 23, a date following the local media's publication of composite sketches of the prime suspect connected with Robin's disappearance.

### 3. *Physical evidence*

Defendant also attempted to discredit the physical evidence introduced by the prosecution. Defendant's mother testified the knife found near Robin's remains was not hers. Defendant established that neither Robin's fingerprints, nor any other physical evidence linked to Robin, was found inside his vehicle. Defendant introduced testimony from friends and employees at the Los Angeles Times, where defendant had been employed, to establish he wore earrings. Although one acquaintance, Jeanette Westenhaver, testified she never had seen defendant wear a gold ball earring or any of the other jewelry recovered from the Seattle storage locker, another acquaintance, Sharon Gonzales, believed defendant had worn such an earring. An expert witness called by the defense testified there was a strong probability that one of the earrings seized from the Seattle storage locker was trimmed with the nail clippers provided to the defense by *defendant's* mother.

### 4. *Inmate testimony*

Defendant introduced evidence from inmate David Vogel in an attempt to discredit Williams's testimony. Vogel claimed he and Williams had discussed the possibility of providing information regarding an inmate named Tommy Thompson, and that Williams wanted Vogel to "put him in," i.e., give Williams the information so that Williams might bargain to reduce the length of his incarceration in exchange for his testimony. Vogel testified that Williams was "desperate" and "wanted to testify in a murder trial."

The prosecution impeached Vogel's testimony by playing a tape recording of a police interview of Vogel conducted in September 1979, when Vogel and defendant were inmates in the Orange County jail. In the tape recording,

Vogel said defendant had admitted having parked alongside the beach and having "happened to see [Robin] again on the bike. . . . That's when he got out of the car and he stopped her and he offered her some money. . . . He said he took a couple of pictures . . . [a]t a park . . . [then] offed [killed] her." According to Vogel, defendant said: "I don't think they can convict me of it, David, to tell you the truth." Vogel said defendant, when asked whether he was guilty, replied: "[H]e was guilty and that uh . . . he don't think they can convict him of it . . . . No evidence. . . . [H]e asked me . . . what I had thought about the case. He was really concerned about if he could beat it or not."

After the jury heard the tape recording of the interview, Vogel testified that although he had informed law enforcement officials in 1979 that defendant had told him he had "offed" a girl named Robin after photographing her at the beach, he (Vogel) had made up that story in an unsuccessful effort to strike an informer's bargain. "I was a selfish, selfish, sleazy dope fiend," Vogel added, "And I wanted to get back to the street, to shoot dope."

## II. Penalty Phase Evidence

### A. The prosecution's case

The prosecution introduced evidence of three prior offenses involving minor females.

#### 1. Tali S.—1968

Tali S. was eight years of age on September 25, 1968. She testified that while walking to school in Hollywood that morning, a man in an automobile followed her and inquired whether she wanted a ride. Tali told the man her parents did not want her to talk with strangers. The man replied, "Oh, I know your parents." He told Tali he would take her to school.

A passerby, Donald Haines, testified he observed the conversation between Tali and the man—whom he identified at the penalty phase as defendant—and moments later saw the girl seated in the back of defendant's vehicle. His suspicion aroused, Haines followed the vehicle, observed defendant escort Tali into a house, and then summoned the police.

Los Angeles Police Officer Christopher Camacho responded to the call. After the officer knocked on the door of the residence, defendant, in the nude, told him, "Wait a minute. I will be right back." When defendant failed to return promptly, Comacho kicked in the front door and saw Tali lying on

the floor, apparently dead, "in a semi spread eagle position with a bar across her neck. . . . There was blood between her legs . . . blood all over the floor." As he was searching the house, Camacho heard a muffled cough, returned to where Tali's body lay, and discovered that the bar had moved from her neck. He summoned an ambulance, then searched the neighborhood for defendant, who eventually was apprehended and convicted of child molestation. Tali emerged from a coma several weeks after the incident, unable to sit up, and was bedridden for months.

### 2. *Julie J.—1974*

Julie J. was 13 years of age on October 16, 1974.[8] She testified that while waiting for a bus to take her to school in Huntington Beach that day, a man approached her, introducing himself as "John Ronald." The two engaged in a conversation, during which the man—whom the police later identified as defendant—learned Julie's age and persuaded her to allow him to drive her to school. As they passed Julie's school, defendant ignored her requests to be dropped off, and continued toward Pacific Coast Highway. There, defendant parked his automobile and escorted the frightened girl toward the cliffs overlooking the ocean. When Julie attempted to walk away, defendant grabbed her. He then invited her to smoke marijuana. Julie never had smoked marijuana but acquiesced out of fear. Defendant "French-kissed" Julie and told her he wanted to be "passionate." The police arrived and arrested the two for smoking marijuana.

### 3. *Monique H.—1979*

Monique H. was 15 years of age on February 12, 1979, when defendant picked her up as she was hitchhiking in Pasadena. Law enforcement officials from Riverside County testified Monique encountered them the next day in a beaten, hysterical state, and identified defendant as her assailant. Defendant was arrested and, after being advised of his constitutional rights, agreed to speak to the police. In a tape-recorded interview introduced at the penalty phase, defendant described taking Monique to a dirt road in the mountains. He said he photographed her in the nude, and as she simulated sexual acts with him. At some point, these allegedly consensual activities ceased, and defendant admitted that he thereafter choked Monique until she was unconscious, tied her wrists and ankles with rope, and, after she revived, stuffed her shirt in her mouth to force her to stop screaming, finally raping and sodomizing her. Defendant faced criminal charges arising from his assault of

---

[8]Julie J. looked considerably younger than her actual age. Defendant's former parole officer, Dennis McNaught, testified that upon meeting Julie, "I thought it was her little sister . . . because she was so small and appeared to be maybe 8 years old. . . ."

Monique and had been released on bail when he was arrested for the murder of Robin Samsoe.

B. *The defense case*

At the penalty phase, the defense presented evidence relating to four separate points. First, evidence was introduced indicating that defendant was a model prisoner and a skilled typist who could be useful as a prison clerk were he to receive a life sentence. Second, defendant's mother testified that he was born in 1943, had been a quiet, studious boy who ultimately joined the Army, and always had been kind to her. Third, the defense sought to establish that defendant had not molested Julie J., and presented the testimony of Julie's school counselor, who testified Julie had a truancy problem and was prone to dishonesty. Fourth, the defense presented evidence intended to demonstrate that defendant had not killed Robin.

With regard to this final point, defendant testified on his own behalf (not having done so at the guilt phase), stating that on June 20, 1979, he had driven by the area where Robin had been photographed but had not stopped at Huntington Beach. He stated he went to a photography store, to a friend's home in Seal Beach and, upon discovering that the friend was not home, to Knott's Berry Farm amusement park. He admitted photographing Lorraine Werts at Sunset Beach around midday but denied going to the mountains and denied telling inmate Williams anything about the case. He testified he had made the telephone call from his home on June 20 at 5:54 p.m. He further testified he had purchased the gold ball earrings found in the Seattle storage locker, and had used fingernail clippers to alter them. He denied his Datsun automobile resembled the Datsun described by Crappa. Finally, he said he had rented the Seattle storage locker and had planned to leave Southern California in order to flee the charges stemming from his assault of Monique H., not because he had committed any offense against Robin.

Defendant was impeached with evidence regarding his background and prior conduct. On cross-examination, he testified that after attacking Tali S. in 1968, he eluded law enforcement officials, withdrew his life savings, and moved to New York, where he changed his name to Jon Berger. He worked at a camp in New England with teenage girls. When arrested on a fugitive warrant stemming from his assault on Tali S., he lied to the Federal Bureau of Investigation about his identity in an effort to avoid imprisonment. In March 1972, he was convicted of child molestation and sentenced to state prison.

Defendant was released from prison in August 1974. Ten weeks later, he was arrested on the Huntington Beach cliffs with Julie J. Although defendant

claimed Julie furnished the marijuana and suggested they smoke it, he ultimately pleaded guilty to felony possession of marijuana and was returned to state prison for three years.

Defendant was released on parole in June 1977. Nine months later, defendant was found in possession of marijuana; a search of his briefcase and residence revealed photographs depicting nude male and female children. Defendant was placed in custody for a few weeks, released, and discharged from parole in June 1978.

Eight months after his discharge from parole, defendant met Monique H., who he learned was 15 years of age. To avoid returning to prison for attacking Monique, defendant was preparing to skip bail. The incident involving Monique led to defendant's conviction in September 1980 of rape and assault with intent to inflict great bodily injury.

On redirect examination, defendant again professed his innocence and requested that the jury impose a sentence of life imprisonment without the possibility of parole. "In prison," he said, "I'm not a threat to children. . . . I am absolutely harmless."

## DISCUSSION

### I. ISSUES RELATED TO THE GUILT AND SPECIAL CIRCUMSTANCE PHASE

#### A. *Admissibility of testimony of hypnotized witnesses*

Defendant contends the trial court committed reversible error in permitting Bridget Wilvert and Lorraine Werts[9] to testify at trial. Each witness had been hypnotized during the police investigation following Robin's disappearance. Defendant argues that our decisions in *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354] and *People* v. *Guerra* (1984) 37 Cal.3d 385 [208 Cal.Rptr. 162, 690 P.2d 635] require reversal. In those decisions, we held that a witness who previously has been hypnotized may not testify concerning matters recalled under hypnosis. (See 31 Cal.3d at pp. 66-67, 70; 37 Cal.3d at p. 390.) As explained below, we conclude that reversal is not warranted.

#### 1. *The evidentiary hearing*

Prior to trial, defendant moved to exclude the testimony of Bridget Wilvert and Lorraine Werts, based on uncontroverted evidence that police

---

[9]At the time of trial, this witness's name was Lorraine Werts Crevling, but to avoid confusion we shall refer to her as Lorraine Werts, her name in 1979 when the relevant events occurred.

investigators had hypnotized the witnesses in 1979. The trial court conducted an evidentiary hearing, at which the parties contested whether our decisions in *People* v. *Shirley, supra,* 31 Cal.3d 18 and *People* v. *Guerra, supra,* 37 Cal.3d 385 barred introduction of the proffered testimony.

### a. *Bridget Wilvert*

On June 21, 1979, the day following Robin's disappearance, Jim Bogdanoff of the Huntington Beach Police Department interviewed Bridget regarding the events of the preceding day. After the interview, Bridget met with police artist Marilyn Droz for the purpose of creating a composite drawing. No hypnosis of Bridget was attempted on this date. On the basis of Bridget's recollection, the police artist created a composite drawing, which was photographed by the police.

On the following day, June 22, Droz's husband and colleague, investigator Arthur Droz, met with Bridget. Investigator Droz had received formal training in hypnosis. He was joined by Marilyn Droz and Sergeant Ron Jenkins, who was supervising the department's investigation of the case. The purpose of this interview was to hypnotize Bridget with the objective of enhancing the June 21 composite drawing. The interview was conducted pursuant to specific department guidelines and was audio tape-recorded. In accordance with Bridget's recollection under hypnosis, the police artist slightly modified the June 21 drawing to show a light moustache and a "five-o'clock shadow."

### b. *Lorraine Werts*

When the police investigators opened the Seattle storage locker in July 1979, they seized hundreds of photographs and slides, five of which showed a girl posing at what appeared to be Sunset Beach, just north of Huntington Beach. At the police investigators' request, Los Angeles and Orange County newspapers published one of the photos with a plea for assistance. Lorraine Werts responded, identifying herself as the girl in the photograph. Police investigators interviewed her regarding the circumstances surrounding her having posed. Lorraine described the photographer but was unable to pinpoint *the exact date* the photos were taken, except to say she thought they were taken between June 19 and June 23, 1979. In an effort to assist Lorraine in recalling the precise date she was photographed, Grover Payne, a Huntington Beach Police Department captain, hypnotized Lorraine according to department guidelines, in a session that was audio tape-recorded. During this hypnotic session, Lorraine identified the date she was photographed as June 18.

### c. *The court's ruling*

After considering the foregoing facts, the trial court denied defendant's motion to exclude the girls' testimony. The court found all of the information relating to the June 21 composite drawing to have come from Bridget: "[T]here's nothing to indicate [that] there is any tainting by law enforcement here to improve her recollection . . . ." Similarly, with respect to Lorraine, the court found the testimony she might offer at trial to be unrelated to the focus of the hypnotic session. The court concluded: "I'd be stretching *Shirley* beyond what it was intended, if I would rule out" the proffered testimony.

### 2. *The witnesses' testimony at trial*

At trial, Bridget and Lorraine each testified briefly. Bridget recounted the events of June 20, stating that upon leaving Bridget's residence, she and Robin went to the cliffs overlooking the beach, that a man approached to photograph them for a contest and left immediately after Bridget's adult neighbor, Jackelyn Young, arrived, and that Bridget and Robin left the cliffs for Bridget's residence, where Bridget loaned her bicycle to Robin. Bridget also reviewed the events of June 21, explaining that she spoke with police officers and assisted an artist in preparing a composite drawing of the photographer. Bridget was shown a photograph of a composite drawing, which she identified as the one she helped create on June 21. The prosecution did not ask Bridget to testify regarding the hypnotic session of June 22 or to testify regarding any corresponding enhancements that were made to the composite drawing. Nor did the prosecution ask Bridget to identify the person shown in the drawing.

In her testimony, Lorraine recounted the events of a date in June 1979 when she and her friend, Patty Elmendorf, were rollerskating at Sunset Beach and were stopped by a man who asked to take their photograph. Patty declined and skated away to a bathroom; the man, explaining that he wanted to enter a contest, took some photographs of Lorraine. The man also asked her "personal questions" and invited her to have lunch with him at a nearby Jack-in-the-Box, but she declined. Lorraine identified five photographs showing her at Sunset Beach as the ones she believed were taken by the man. When the prosecution asked her to provide a general description of him, Lorraine replied she was unable to do so. The prosecution refrained from asking her to pinpoint the date of the incident.

The trial court, however, then asked Lorraine whether she recalled the date the photographer had encountered her and Patty, and Lorraine answered, "June 20."

### 3. *The applicable case law*

In *People* v. *Shirley, supra,* 31 Cal.3d 18, the prosecution subjected the key complaining witness, a rape victim, to hypnosis on the eve of trial "for the purpose of 'filling the gaps' in her story." (*Id.,* at p. 23.) The trial court denied defendant's motion to exclude the witness's testimony, and at trial the victim testified to several matters that she had been unable to recall prior to being hypnotized. (*Id.,* at pp. 29-30.) In *Shirley,* this court reversed the defendant's conviction, finding, inter alia, that the use of hypnosis to restore the memory of a potential witness is not generally accepted as reliable by the relevant scientific community. (*Id.,* at pp. 66-67.) We held that the "testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward." (*Ibid.*)

Significantly, we noted in *Shirley, supra,* that our disapproval of testimony from a previously hypnotized witness was not absolute. We set forth several limitations on the rule excluding such testimony. (31 Cal.3d at pp. 67-68.) First, we observed, when the prosecution seeks "to question such a witness on a topic *wholly unrelated* to the events that were the subject of the hypnotic session, his [or her] testimony as to that topic would not be rendered inadmissible . . . ." (*Id.,* at p. 67, original italics.) Second, we recognized a valid purpose in allowing hypnosis by the police "for purely investigative purposes," subject to our caveat that any person so hypnotized "will not be allowed to testify as a witness to the events that were the subject of the hypnotic session." (*Id.,* at pp. 67-68.) Third, we noted that the improper admission of testimony from a previously hypnotized witness is not reversible per se; its effect is measured under the prejudicial-error standard set forth in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (*People* v. *Shirley, supra,* 31 Cal.3d at p. 68.)

We took no position in *Shirley, supra,* with respect to the admissibility of testimony from witnesses who had been hypnotized prior to the date our decision was filed, March 11, 1982. (31 Cal.3d at p. 67, fn. 53.) In *People* v. *Guerra, supra,* which also involved a hypnotized rape victim, we held the principles set forth in *Shirley* applied to all cases not yet final on March 11, 1982. (37 Cal.3d at p. 390.) Because defendant's case was on appeal and therefore not final on March 11, 1982, *Shirley* is applicable to the present appeal. (See also *People* v. *Hayes* (1989) 49 Cal.3d 1260, 1269 [265 Cal.Rptr. 132, 783 P.2d 719] [reaffirming *Shirley*'s retroactivity].)

*Guerra, supra,* foreshadowed our consideration of the question whether "prehypnotic evidence," i.e., matters recalled and related by a witness prior

to the hypnotic session, is admissible. (37 Cal.3d at pp. 427-429.) In a concurring opinion, Justice Kaus explained why he believed such evidence should be admissible, observing "the probable reliability and potential importance of the evidence justifies its admission." (*Id.*, at p. 431 (conc. opn. of Kaus, J.).) Because the issue was unnecessary to the resolution of the *Guerra* appeal, the majority in *Guerra* left the question unanswered. (*Id.*, at p. 429.)

We revisited the issue of prehypnotic evidence in *People* v. *Hayes, supra,* 49 Cal.3d 1260. The defendant in *Hayes* was charged with murder, rape of the murder victim's spouse, and other offenses occurring in 1979. Marie G., the rape victim, furnished the responding police officer with a description of her assailant and his accomplice. Within hours, the police hypnotized her to assist a police artist in creating a composite sketch of the assailant, and to develop more information regarding the offenses. (*Id.*, at p. 1262.)

Pursuant to decisions in *Shirley, supra,* 31 Cal.3d 18, and *Guerra, supra,* 37 Cal.3d 385, this court in *Hayes, supra,* 49 Cal.3d 1260, held that the admission at trial of Marie's *post*hypnotic testimony, notably her positive identification of defendant as her assailant, required reversal of the convictions. (*Id.*, at pp. 1262-1263, 1270; see also *People* v. *Clark* (1992) 3 Cal.4th 41, 149-151 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People* v. *Miller* (1990) 50 Cal.3d 954, 982-986 [269 Cal.Rptr. 492, 790 P.2d 1289].) With regard to her *pre*hypnotic testimony, we held it would be admissible at retrial as to events the trial court found were "recalled and related prior to the hypnotic session." (*People* v. *Hayes, supra,* 49 Cal.3d at pp. 1263, 1270-1273.) In reaching this conclusion, the *Hayes* opinion agreed with Justice Kaus's view that cases in which the prehypnotic evidence was obtained prior to this court's decision in *Shirley,* evoked " 'a special need to ensure that in our zeal to protect the citizenry from the hazards of hypnosis, we do not create a greater injustice by an after-the-fact disqualification of crucial witnesses who have relevant—frequently vital—information that is not tainted by the hypnosis.' " (*People* v. *Hayes, supra,* 49 Cal.3d at p. 1271, quoting *People* v. *Guerra, supra,* 37 Cal.3d at p. 431 (conc. opn. of Kaus, J.).) Our holding in *Hayes* governs the admissibility of all prehypnotic evidence predating January 1, 1985. (49 Cal.3d at p. 1273.)

 With the foregoing principles in mind, we turn to defendant's contention that the trial court committed reversible error in admitting the testimony of the previously hypnotized witnesses, Bridget Wilvert and Lorraine Werts.

### 4. *The testimony was admissible under Hayes*

As noted, defendant contends that under this court's decisions in *Shirley* and *Guerra*, it was error for the trial court to permit Bridget and Lorraine to

testify and that the admission of their testimony requires reversal of the judgment. We disagree.

■ Bridget's testimony regarding the composite sketch she helped create prior to her June 22 hypnotic session was properly admitted under the principles set forth in our decision in *People* v. *Hayes, supra,* 49 Cal.3d 1260. The police investigators preserved her prehypnotic recollection by photographing the June 21 composite drawing of the suspect, which clearly established that Bridget's testimony pertained to matters that she had both recalled and related to other persons prior to undergoing hypnosis, thus meeting the test of admissibility set forth in *Hayes.* (49 Cal.3d at pp. 1272-1273; compare *People* v. *Miller, supra,* 50 Cal.3d at pp. 983-984 [*Hayes* "prehypnotic evidence" rule held inapplicable where all copies of prehypnotic composite drawing were lost prior to trial and witness testified the drawing was inaccurate].) The prosecution confined its questioning concerning the composite sketch to prehypnotic evidence.

Similarly, Bridget's testimony regarding the events of June 20, with the exception of a single response, was admissible under *Hayes, supra,* 49 Cal.3d 1260. The exception is as follows. The prosecution asked Bridget at trial whether defendant touched Robin when he had her pose for the photographs taken on the cliffs above Huntington Beach. Bridget replied affirmatively, recalling that defendant had touched Robin's leg. The defense did not interpose an objection to this testimony. Several days after Bridget had testified, however, defendant requested that her response be stricken on the ground that, because she had not mentioned prior to her June 22 hypnotic session that defendant had touched Robin, Bridget's testimony on this particular point was the product of a posthypnotic recollection and was therefore inadmissible. The trial court viewed the request as untimely but nevertheless admonished the jury to disregard Bridget's testimony that defendant had touched Robin when they were on the cliffs. In light of the trial court's admonition, and the relative insignificance of the challenged testimony, any error committed by the trial court in admitting Bridget's response to this single question was harmless. (*Watson, supra,* 46 Cal.2d at p. 836.)

■ Lorraine's testimony, with two exceptions, was confined to matters that she had both recalled and related to other persons prior to her hypnosis, and thus was properly admitted under *Hayes, supra,* 49 Cal.3d 1260. The exceptions are as follows.

First, Lorraine's response to the question posed by the trial court—that she identify the date she was photographed—was inadmissible under *Shirley,*

*supra*, 31 Cal.3d 18, because the inquiry involved a matter identical to the subject of her hypnosis. Nonetheless, under the applicable *Watson* standard, the court's error in eliciting this testimony was not prejudicial. (*Watson, supra*, 46 Cal.2d at p. 836.) At trial, in addition to presenting the testimony of Lorraine, the prosecution called as a witness Patty Elmendorf, the friend of Lorraine's who was rollerskating with her when the two were approached by defendant. Patty testified that the date on which the incident occurred was June 20, 1979, the same date related by Lorraine in her testimony. Patty was certain of the date in light of an entry in her diary, and the diary itself was received in evidence. Patty further identified defendant as the photographer who had confronted the two girls on that date. In view of Patty's testimony, it is not reasonably probable that the trial court's erroneous elicitation of Lorraine's reference to June 20 affected the jury's verdict.

Second, several days after the conclusion of Lorraine's testimony, defendant requested that the portion of her testimony relating the photographer's request that she accompany him to lunch and provide him with her address be stricken as posthypnotic recollections. The trial court granted the request, admonishing the jury to disregard this testimony. In light of the court's admonition and the marginal relevance of the testimony in question, any error in admitting this evidence was harmless. (*Watson, supra*, 46 Cal.2d at p. 836.)

■ Our decision in *Hayes, supra*, also disposes of defendant's additional contention that the testimony of the hypnotized witnesses should have been excluded because the hypnotic sessions did not conform to the procedures set forth in Evidence Code section 795.[10] In *Hayes, supra*, we concluded that Evidence Code section 795 properly should be interpreted to apply only to hypnotic sessions conducted on or after January 1, 1985, the effective date of the statute. (49 Cal.3d at pp. 1273-1274.) We also explained that our holding in *Hayes* regarding prehypnotic evidence "shall govern the admissibility of all prehypnotic evidence predating January 1, 1985—regardless of when such evidence was or may in the future be offered at trial." (*Id.*, at p. 1274.) Thus, defendant's reliance on Evidence Code section 795 is misplaced.

In sum, we find no prejudicial error in the admission of the challenged testimony. (*People v. Shirley, supra*, 31 Cal.3d at p. 68; see also *People v. Caro* (1988) 46 Cal.3d 1035, 1048, fn. 4 [251 Cal.Rptr. 757, 761 P.2d 680] [*Watson* test applicable to erroneous admission of testimony by previously hypnotized witness]; *People v. Watson, supra*, 46 Cal.2d at p. 836.)

---

[10]Evidence Code section 795 sets forth a list of conditions which, if met, permit a trial court to determine that the testimony of a previously hypnotized witness is not rendered inadmissible by "the fact that the witness has previously undergone hypnosis for the purpose of recalling events which are the subject of the witness'[s] testimony . . . ."

### B. *Admissibility of Dana Crappa transcripts*

Defendant contends the trial court committed reversible error in declaring Dana Crappa unavailable as a witness pursuant to Evidence Code section 240, subdivision (a)(3),[11] and in permitting transcripts of her testimony at defendant's first trial to be read to the jury pursuant to Evidence Code section 1291, subdivision (a)(2).[12] Defendant also argues the court's rulings denied him his constitutional right to confront and cross-examine the only witness who tied him to the scene of Robin's murder. For the reasons set forth below, we find these contentions to be without merit.

#### 1. *Crappa's loss of memory*

##### a. *Evidence at the Evidence Code section 402 hearing*

Shortly before Crappa was scheduled to testify at trial, the prosecutor informed the court, outside the presence of the jury, that Crappa "is not going to testify because she doesn't have any recollection about the events in this case. . . ." The prosecutor moved that the trial court declare Crappa unavailable as a witness (Evid. Code, § 240, subd. (a)(3)), and permit Crappa's testimony from defendant's first trial to be read to the jury pursuant to the prior-testimony exception to the hearsay rule. (Evid. Code, § 1291, subd. (a)(2).) Before ruling on the motion, the trial court requested that Crappa testify at a foundational hearing held pursuant to Evidence Code section 402.[13]

A hearing was conducted outside the presence of the jury, during which Crappa testified she had no recollection of her activity at Chantry Flats or, more specifically, of the events to which she testified at defendant's first trial. The trial court made a preliminary determination that Crappa was "unavailable to testify within the meaning of the [Evidence Code] statutes at

---

[11]Evidence Code section 240, subdivision (a)(3), provides, in pertinent part, that a declarant is unavailable to testify if he or she is "unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity."

[12]Evidence Code section 1291, subdivision (a)(2), provides: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and . . . [¶] . . . [t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

[13]Evidence Code section 402 provides, in pertinent part: "(a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article. [¶] (b) The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury . . . . [¶] (c) A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."

this time." The court determined, however, that the jury should be allowed to evaluate her demeanor and hear why she was unable to testify.

Proceedings were resumed in the presence of the jury. As she had at the foundational hearing, Crappa testified to a complete loss of memory with regard to the events that related to this case. She testified she could not recall appearing in court to testify at defendant's first trial. She acknowledged having consulted a psychiatrist or psychologist regarding her memory lapse.[14]

---

[14]In pertinent part, Crappa testified as follows (all questions are by the prosecution, except where otherwise noted):

"Q: Miss Crappa, as I understand it, there are a couple periods in your life that today you are having a difficult time remembering, is that accurate?

"A: Yes, sir.

"Q: Okay. And is one of those times the time period when you worked for the United States Forestry Service up in Chantry Flats?

"A: That's correct.

"Q: . . . . Okay. Do you remember testifying about a case that you became involved in as a witness when you were working as a fire fighter at Chantry Flats?

"A: No, sir.

"Q: . . . . Do you have any recollection at all coming to court and testifying about events that you allegedly witnessed while you were a fire fighter at Chantry Flats?

"A: No, sir.

"Q: And you have had a chance to read testimony that purports to be yours given in a courtroom in Orange County on several days in 1980, is that true?

"A: That's correct.

"Q: And as you read that testimony, you have no recollection of either testifying or those events, is that your testimony?

"A: That's correct.

"Q: . . . . Do you have any recollection at any time in your life of ever being sworn to tell the truth and thereafter intentionally lying?

"A: No, sir, no sir.

"Q: . . . . Do you have any recollection of ever being interviewed by a police officer about a crime that you allegedly were a witness to or some aspect of it and intentionally lying to a police officer?

"A: No, sir.

"Q: [by the court] Well, I am—I don't like to interrupt. [¶] Do you have any recollection talking to a police officer about this case, period?

"A: No, sir.

"Q: . . . . [Y]our testimony again here today is that other than reading [prior testimony], you have no recollection concerning the events that you are testifying about there; is that right?

"A: That's correct.

"Q: All right. At sometime in the past couple of years, have you been to see somebody, a psychiatrist or a psychologist?

"A: Yes, sir.

"Q: . . . . Have you been told at some point when you were seeing a psychiatrist or a psychologist that you apparently have something in there that you are not ready to deal with, and you won't be able to remember it until you are ready to deal with it, something along those lines?

Thereafter, the trial court excused the jury. The court informed the parties that Crappa "probably has a preexisting mental infirmity so as not to recall her testimony. . . . And it seems to me that infirmity is such as to permit the introduction of her former testimony. And I don't think she's refusing by her own choice." The court observed that the prosecution had the burden of proving unavailability and, prior to issuing its final ruling, gave the parties five days to prepare the necessary arguments for a full evidentiary hearing.

At the evidentiary hearing, the prosecution presented testimony of Dr. Anthony Staiti, a psychiatrist who had examined Crappa on three occasions in 1985, one year prior to defendant's second trial. Staiti testified Crappa had been referred to him by another psychiatrist for a determination whether she would be capable of working as a police dispatcher. He testified Crappa complained of memory lapses that impeded her efficiency. Staiti affirmed that she had described to him "periods of waking up suddenly screaming and shaking, totally panicked without knowing why." Crappa told him that after awakening in a frightened state, she usually could not return to sleep but would, instead, remain awake, waiting for the time to go to work.

Staiti diagnosed Crappa as suffering from "posttraumatic stress disorder chronic delayed," one of the symptoms of which is memory impairment arising at least six months following the initial trauma. Based on his consultations with Crappa in 1985, he opined her memory lapse with respect to events in 1979 "had something to do with a murder. . . ."

Following the prosecution's direct examination of Dr. Staiti, defense counsel informed the court that the defense had yet to complete its review of the psychiatric reports that Dr. Staiti had brought to court, which consisted of between 20 and 30 pages. The defense requested an opportunity to review this material before cross-examining Dr. Staiti. The prosecutor argued that approximately one-half of the material appeared to be comprised of an M.M.P.I. (Minnesota Multiphasic Personality Inventory) examination, which Staiti testified he had not considered. The court recessed to allow the defense to review Dr. Staiti's reports, after which defense counsel proceeded with

---

"A: Essentially.

"Q: . . . . [A]s you sit there today, Miss Crappa, you are telling us under oath that you have no recollection of ever being involved in any court activity in connection with anything you witnessed on a road on the way up to Chantry Flats?

"A: That's correct.

"Q: . . . . [by the court] Do you recall what your duties—your working up there, any type of activity that you actually did there?

"A: I only recall that I worked there.

"Q: Okay. Do you recall anything about working at Chantry Flats as a fire fighter other than what you told us, other than the fact that you did work there?

"A: No, sir."

cross-examination, without requesting any further continuance in order to prepare. At the conclusion of the cross-examination, defense counsel reiterated a request (set forth in moving papers opposing a finding that Crappa was unavailable) that the trial court order an independent psychiatric examination of Crappa to assist the court in ascertaining the validity of Crappa's memory loss. The court denied the request.

Defendant called as a witness, at the hearing, Judge Philip E. Schwab, who presided over defendant's first trial. Judge Schwab testified that during Crappa's testimony at the first trial, there were "substantial delays between the question and an answer, sometimes running perhaps close to a minute, perhaps even longer."

After hearing the testimony presented at the hearing, the trial court indicated it was adhering to its preliminary determination that Crappa was unavailable as a witness within the meaning of Evidence Code section 240, subdivision (a)(3).[15]

### b. *Defendant's challenge*

On appeal, defendant's challenge to the trial court's ruling admitting testimony from the first trial is based on three distinct arguments. First, defendant contends the trial court's conclusion that Crappa was unavailable within the meaning of the statute was not supported by substantial evidence. Second, defendant contends his interest and motive in cross-examining Crappa at the first trial were not the same as at the second trial, and therefore, the trial court erred in admitting the prior testimony pursuant to Evidence Code section 1291, subdivision (a). Third, defendant contends the admission of Crappa's prior testimony violated his constitutional right to confrontation. We shall address each of defendant's contentions in turn.

### 1. *Whether Crappa was unavailable within the meaning of Evidence Code section 240, subdivision (a)(3)*

Dana Crappa testified (in essence) that a loss of memory precluded her from offering any relevant testimony at defendant's second trial. The prosecutor and the trial court questioned Crappa extensively to determine

---

[15]The trial court stated: "I observed [Crappa] closely during her testimony . . . . [¶] I don't think it is a situation [whereby] she's refusing [to answer] by choice. . . . [¶] I don't think [Crappa's unavailability is] a particularly close question . . . . [¶] I think it's obvious to the court that in this type of situation that . . . the jury should have the information available. [¶] There's been many tape recordings [of police interviews with Crappa], examination at the preliminary hearing plus the trial . . . . [¶] I'm going to allow [Crappa's] testimony to be presented via transcripts. . . ."

whether she possessed any recollection whatsoever relevant to the case. She claimed she had none. The prosecution also presented evidence that Crappa's memory loss had existed for at least one year and was connected to a stress-related disability. Over defendant's objection, the trial court admitted Crappa's prior testimony under Evidence Code section 1291, subdivision (a), because the court found Crappa "unavailable" to testify within the meaning of Evidence Code section 240, subdivision (a)(3), which defines witness unavailablity to include being "unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity."

On appeal, defendant contends the prosecution failed to meet its burden of proving that Crappa was unavailable. Further, defendant contends Dr. Staiti had insufficient contact with Crappa to render an expert opinion, and therefore the trial court's ruling was not supported by expert testimony connecting Crappa's memory loss to a mental illness or infirmity. Defendant also contends the trial court erred in denying defendant's request for an independent psychiatric examination of Crappa to assist in determining the veracity of Crappa's asserted memory loss. We reject these arguments for the following reasons.

a. *Substantial evidence supports the trial court's finding of unavailability*

■ Defendant challenges, on substantial evidence grounds, the trial court's finding that Crappa was unavailable. We find this contention to be without merit. In response to thorough questioning by the prosecution and the trial court, Crappa testified unequivocally that she had lost all memory of relevant events. Although the trial court was not required to credit Crappa's testimony, the court made clear that it found her credible and believed that she lacked recollection. On this basis, we reject defendant's argument that Crappa's own testimony at the Evidence Code section 402 hearing, attesting to her total inability to recall any relevant information, did not constitute substantial evidence in support of the trial court's finding of unavailability.

Defendant contends the total memory loss to which Crappa testified fails to constitute a "mental infirmity" within the meaning of Evidence Code section 240, subdivision (a)(3). We cannot agree. The unusual situation presented here, in which a witness who testifies in considerable detail at one trial, but—ostensibly due to the intervening onset of memory loss—claims a complete inability to recall relevant events at retrial, is analogous to that presented in *People* v. *Rojas* (1975) 15 Cal.3d 540 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127], a case in which a witness who testified at one trial refused to testify at retrial based upon an intervening fear of retaliation.

In *Rojas, supra,* 15 Cal.3d 540, we affirmed the trial court's ruling admitting the witness's former testimony under Evidence Code section 1291, subdivision (a), after the trial court found that the witness's fear rendered him "unavailable" to testify under Evidence Code section 240, subdivision (a)(3). (15 Cal.3d at p. 552.) In that situation, we held that a witness's fear of retaliation permitted a trial court to find that the witness suffered from a "mental infirmity," which we defined as " 'a defect of personality or weakness of the will.' " (*Id.,* at p. 551, citing Webster's Third New. Internat. Dict.; see also *People* v. *Francis* (1988) 200 Cal.App.3d 579, 587 [245 Cal.Rptr. 923] [witnesses, who refused to testify despite trial court's extensive efforts to persuade them to testify, found to be unavailable]; *People* v. *Quaintance* (1978) 86 Cal.App.3d 594, 596 [150 Cal.Rptr. 281] [witness who "had seen 'seven deaths' while in the state prison . . . feared he would meet the same fate if he allowed a 'snitch jacket' to be placed on him by giving testimony"].) We adopted the view, set forth in *People* v. *Gomez* (1972) 26 Cal.App.3d 225, 229-230 [103 Cal.Rptr. 80], that the showing required to establish unavailability based on illness or infirmity must be left to the trial court's discretion. (*People* v. *Rojas, supra,* 15 Cal.3d at pp. 550-551.)

Similarly, in the situation presented here, Crappa's professed inability to remember any relevant information—an inability that postdated defendant's first trial, and had compelled Crappa to seek a medical diagnosis for purposes unrelated to the present case—does not offend the *Rojas* definition of "mental infirmity." The referenced colloquy between the prosecution and Crappa revealed the witness's unequivocal refusal or inability to provide relevant testimony. (See fn. 14, *ante.*) Although Crappa's professed loss of memory was factually distinct from the fear of retaliation experienced by witnesses in *Rojas, Francis,* and *Quaintance,* the result was identical: the prosecution was precluded from obtaining requested testimony from a witness present in court, and the court thus was justified in determining that Crappa was unavailable.

Defendant's reliance on *People* v. *Sul* (1981) 122 Cal.App.3d 355 [175 Cal.Rptr. 893] is misplaced. In *Sul,* the witness voluntarily declined to testify, leading the trial court to find him in contempt, send him to jail, and declare him to be unavailable. (*Id.,* at pp. 358-359.) The appellate court concluded the trial court should have taken further action to coerce the witness to testify before ruling as to his availability. (*Id.,* at pp. 365-367.) By contrast, the trial court in the present case participated in extensive questioning of Crappa and observed her closely in order to determine whether she possessed any relevant recollection. The trial court believed her memory loss to be genuine and not of her own choice. In view of the trial court's finding,

the ability of Crappa to testify in the present case—unlike that of the witness in *Sul*—would not have been influenced by any amount of coercion from the court.

Defendant further contends, however, that even if Crappa's condition constituted a "mental infirmity" within the meaning of the statute, such mental infirmity could be established only by expert medical evidence, and not by the testimony of Crappa, herself. We reject this contention. In *Rojas*, *supra*, we upheld a finding of witness unavailability on the basis of the witness's "mental infirmity" in the absence of expert medical testimony. (15 Cal.3d at pp. 548-552.) Other decisions have similarly so held. (See, e.g., *People v. Stritzinger* (1983) 34 Cal.3d 505, 516-517 [194 Cal.Rptr. 431, 668 P.2d 738] ["Reviewing courts have typically and properly required *either* expert testimony on the witness's present condition, *or* the witness's own express refusal to testify at trial." (Italics added.)]; compare *People v. Bojorquez* (1880) 55 Cal. 463, 463-464 [undersheriff's testimony that witness was unwell and "not able" to leave his room held insufficient to permit introduction of witness's deposition]; *People v. Rinesmith* (1940) 40 Cal.App.2d 786, 790 [105 P.2d 1021] [police officer's testimony that witness was "too ill to attend the trial" insufficient to permit introduction of witness's preliminary-examination testimony]; see also *Sanchez v. Bagues & Sons Mortuaries* (1969) 271 Cal.App.2d 188, 193 [76 Cal.Rptr. 372] [elderly witness's deposition statement regarding his physical infirmity could not be used to establish his own unavailability because witness's condition at time of deposition "was not proof of his physical infirmity at time of trial," and no medical testimony was presented indicating that the witness was unable to appear in court].)

Accordingly, we conclude that Crappa's own testimony at retrial, believed by the trial court, was sufficient to support the trial court's finding that she was unavailable to testify. Thus, we need not reach defendant's contention that the testimony of Dr. Staiti, who had interviewed Crappa one year prior to defendant's retrial, was not sufficiently probative with regard to Crappa's mental condition at the time of the second trial to support the trial court's finding that Crappa was unavailable. Under the facts of this case, Dr. Staiti's medical testimony was not required. (See *People v. Stritzinger*, *supra*, 34 Cal.3d 505; *People v. Rojas*, *supra*, 15 Cal.3d at pp. 550-551; *People v. Gomez*, *supra*, 26 Cal.3d at p. 230.)

> b. *The trial court did not err in refusing to order an independent psychiatric examination of Crappa*

■ Defendant contends the trial court erred in rejecting defendant's request for an independent psychiatric examination of Crappa to ascertain

the veracity of her professed amnesia. He suggests that Crappa may have feigned memory loss to avoid reliving painful memories and stressful cross-examination. Although past cases have suggested that "[a]mnesia is very easy to feign and hard to disprove" (*People* v. *McBroom* (1968) 264 Cal.App.2d 242, 247 [70 Cal.Rptr. 326]), we conclude that defendant's argument lacks merit. The trial court found that an independent psychiatric examination would neither "add [n]or detract" in the court's evaluation of her claim of lack of recollection, and neither the facts of this case nor the relevant case law suggests that the trial court was required to order such an examination. The trial court's finding that Crappa was unavailable to testify was based on its own close observation of Crappa's demeanor and responses. Because we have held that expert medical evidence was not required under the facts of this case, we conclude the trial court did not abuse its discretion in denying the request for an independent psychiatric examination.

In an analogous context, neither the Evidence Code nor relevant case law requires our trial courts, when confronted with a witness who claims to have no recollection of a matter as to which he or she previously testified, to interrupt the proceedings in order to enable experts to testify for each side as to whether the witness's claimed lack of recollection is genuine. (See Evid. Code, § 1235; *People* v. *Sam* (1969) 71 Cal.2d 194, 208-210 [77 Cal.Rptr. 804, 454 P.2d 700] [right of impeachment does not exist where witness lacks recollection].) Similarly, with regard to a witness who appears to be "unavailable" due to a total loss of memory, we see no reason to require that expert testimony be heard on this issue.

Furthermore, the trial court's rejection of defendant's request for an independent examination of Crappa is consistent with the judicial policy disfavoring attempts to impeach witnesses by means of psychiatric testimony. (See *People* v. *Cooks* (1983) 141 Cal.App.3d 224, 302 [190 Cal.Rptr. 211]; *In re Darrell T.* (1979) 90 Cal.App.3d 325, 335-336 [153 Cal.Rptr. 261]; *People* v. *Manson* (1976) 61 Cal.App.3d 102, 135-138 [132 Cal.Rptr. 265]; see also § 1112.) California courts have viewed such examinations with disfavor because " '[a] psychiatrist's testimony on the credibility of a witness may involve many dangers: the psychiatrist's testimony may not be relevant; the techniques used and theories advanced may not be generally accepted; the psychiatrist may not be in any better position to evaluate credibility than the juror; difficulties may arise in communication between the psychiatrist and the jury; too much reliance may be placed upon the testimony of the psychiatrist; partisan psychiatrists may cloud rather than clarify the issues; the testimony may be distracting, time-consuming and costly.' " (*People* v. *Manson, supra,* 61 Cal.App.3d at pp. 137-138, citation

omitted.) We therefore find no error in the trial court's rejection of defendant's request.[16]

### c. *A continuance was not required*

■ We also reject defendant's argument, raised for the first time on appeal, that the trial court should have granted defense counsel an extended continuance to allow the defense to consult with its expert prior to examining Dr. Staiti. Defendant did not seek a continuance below, so the argument is not properly before us. (See *People* v. *Clark* (1990) 50 Cal.3d 583, 626, fn. 34 [268 Cal.Rptr. 399, 789 P.2d 127].) Moreover, on the merits, the claim is untenable.[17] When defense counsel sought additional time in which to review Dr. Staiti's notes at the evidentiary hearing, the trial court granted a recess for that specific purpose. The trial court was under no obligation to volunteer, sua sponte, that the defense could have an unrequested continuance. Thus, we discern no error.

### d. *The requirements of Evidence Code section 240 were satisfied*

Based on the foregoing, the record supports the trial court's ruling that Crappa was "unavailable" in that she was "unable . . . to testify," and that this inability was the result of a "then existing . . . mental . . . infirmity." (Evid. Code, § 240, subd. (a)(3).)[18]

---

[16]Because there was no claim at trial that compelling Crappa to submit to a medical examination would impinge upon her right of privacy as guaranteed by article I, section 1, of the California Constitution, the trial court's duty to balance Crappa's right of privacy against defendant's right to a fair trial (a point raised by the People during oral argument) is not properly before us. Accordingly, we express no view on this question.

[17]Throughout this opinion, we shall discuss the merits of particular claims, such as this one, even though they are procedurally barred, when we conclude that such discussion may eliminate uncertainties that could lead to time-consuming, but ultimately unavailing, claims alleging ineffective assistance of counsel. (See *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1044, fn. 5 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

[18]Because we view the trial court's ruling as correct under any standard of review, we need not and do not consider defendant's contention, which stems from dicta contained in *People* v. *Louis* (1986) 42 Cal.3d 969, 984-989 [232 Cal.Rptr. 110, 728 P.2d 180], that de novo review is appropriate in this context. (Compare *People* v. *Hovey* (1988) 44 Cal.3d 543, 563-564 [244 Cal.Rptr. 121, 749 P.2d 776] [citing *Louis*]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 311-312 [168 Cal.Rptr. 603, 618 P.2d 149] [unavailability of witness governed by abuse of discretion standard].)

Additionally, because Crappa professed a *total* inability to recall relevant events at retrial, and therefore was "unavailable" as a witness (Evid. Code, § 240, subd. (a)(3)), we need not and do not address the question whether Evidence Code sections 1235 and 1291, considered together, establish that a witness's prior testimony is admissible where the witness claims only a *partial* inability to recall relevant events. (Compare *People* v. *Hawthorne* (1992) 4

### 2. Whether defendant's opportunity to cross-examine Crappa satisfied the requirements of Evidence Code section 1291, subdivision (a)(2)

Defendant contends that even if the trial court was correct in finding Crappa unavailable within the meaning of Evidence Code section 240, subdivision (a)(3), the court should have barred introduction of Crappa's prior testimony because the testimony failed to satisfy the requirements of Evidence Code section 1291, subdivision (a)(2). The latter statute provides that former testimony from an unavailable declarant is not barred by the hearsay rule if "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." Defendant contends his "interest and motive" in cross-examining Crappa at the second trial were not "similar" to his "interest and motive" at the initial trial.

More specifically, defendant argues that he lacked a "complete" opportunity to cross-examine Crappa at his initial trial. (See *Pointer* v. *Texas* (1965) 380 U.S. 400, 406-407 [13 L.Ed.2d 923, 927-928, 85 S.Ct. 1065].) Defendant cites three areas of inquiry—Crappa's possible hypnosis (see, *post*, pp. 785-789), her competency, and her conversations with a former colleague—in which he claims his cross-examination of Crappa at the second trial might have differed from his cross-examination at the first trial in light of events that postdated his initial trial. Thus, defendant contends, the trial court's finding that Crappa was unavailable denied him the full opportunity to "pierce the veil" of the prosecution's case.

We reject defendant's argument. Crappa's prior testimony was given at defendant's first trial, a proceeding in which he faced identical charges and the identical potential punishment. Crappa's testimony was important to each trial, and defendant's interest and motive in cross-examining her were identical at each. Indeed, at his first trial, defendant subjected Crappa's testimony to cross-examination which this court characterized as "intense." (*Alcala I, supra*, 36 Cal.3d at p. 620.)[19] The defense concentrated on attempting to discredit Crappa and, in particular, challenged her evasive and occasionally inconsistent responses to police questioning during the 1979-1980 pretrial investigation. (*Id.*, at p. 620, fn. 5.) Under these circumstances,

Cal.4th 43, 55-59 [14 Cal.Rptr.2d 133]; *People* v. *Price* (1991) 1 Cal.4th 324, 415 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

[19] The cross-examination of Crappa at defendant's first trial consumed over 300 pages of the reporter's transcript. Crappa also had been cross-examined extensively at the preliminary hearing.

defendant clearly "had the right and opportunity to cross-examine the declarant [at the first trial] with an interest and motive similar to that which he [had] at the [second trial]" so as satisfy the requirements of Evidence Code section 1291, subdivision (a)(2).

Defendant has cited no authority to support his suggestion that a defendant's "interest and motive" in cross-examining a witness at a second trial is not "similar" to his interest and motive at a previous trial, within the meaning of Evidence Code section 1291, subdivision (a)(2), simply because events occurring after the first trial may have led counsel at the second trial to alter the nature or scope of the cross-examination of the witness in certain particulars. Evidence Code section 1291, subdivision (a)(2), does not suggest that prior testimony is admissible only if the cross-examination at the second trial would have been identical to that conducted at the first trial. Rather, the statute conditions the admissibility of the prior testimony on the party (against whom the evidence is admitted) having had an "interest and motive" to subject the witness to a thorough cross-examination, similar to the interest and motive the party has at the later hearing. That requirement clearly was satisfied here. (See, e.g., (*People* v. *Ogen* (1985) 168 Cal.App.3d 611, 615-617 [215 Cal.Rptr. 16] [victim's preliminary-hearing testimony from prior kidnap-rape proceeding admitted against defendant in his trial for victim's murder].)

### 3. *Whether the trial court's admission of Crappa's former testimony violated defendant's right of confrontation*

■ Defendant contends that the admission of Crappa's former testimony, even if statutorily authorized, violated his right of confrontation under the United States and California Constitutions. (See U.S. Const., 6th Amend.; *Pointer* v. *Texas, supra,* 380 U.S. at pp. 403-405 [13 L.Ed.2d at pp. 925-927]; Cal. Const., art. I, § 15; *People* v. *Louis, supra,* 42 Cal.3d at p. 982; see also section 686, subd. (3)(a); *People* v. *Stritzinger, supra,* 34 Cal.3d at p. 515.) We reject this contention. The constitutional right of confrontation is not absolute. (*Barber* v. *Page* (1968) 390 U.S. 719, 722 [20 L.Ed.2d 255, 258-259, 88 S.Ct. 1318]; *People* v. *Stritzinger, supra,* 34 Cal.3d 505.) This right is not violated by the admission of hearsay testimony "where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." (*Barber* v. *Page, supra*; see also *Mancusi* v. *Stubbs* (1972) 408 U.S. 204, 213-216 [33 L.Ed.2d 293, 301-304, 92 S.Ct. 2308]; *People* v. *Wharton* (1991) 53 Cal.3d 522, 589 [280 Cal.Rptr. 631, 809 P.2d 290]; *People* v. *Stritzinger, supra,* 34 Cal.3d 505; *People* v. *Rojas, supra,* 15 Cal.3d at pp. 548-549.) California has recognized this traditional exception to the

confrontation requirement by enacting Evidence Code section 1291. (*People v. Wharton, supra,* 53 Cal.3d 522.)

In *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930], the United States Supreme Court made clear that where a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently "reliable" to satisfy the confrontation requirement. (*Id.,* at pp. 167-168 [26 L.Ed.2d at pp. 502-503].) Under *Green,* such testimony is admissible even when the witness is not subject to *present* cross-examination because of an asserted loss of memory or refusal to answer. (*Ibid.*; see also *United States* v. *Owens* (1988) 484 U.S. 554, 555-561 [98 L.Ed.2d 951, 955-959, 108 S.Ct. 838] [no violation of confrontation clause by admission of a prior, out-of-court identification statement of a witness who is unable, because of loss of memory, to explain the basis for the identification].)[20]

The requirements set forth in the foregoing authorities have been met in the present case. First, as indicated earlier, Crappa's professed memory loss rendered her unavailable as a witness. Second, her prior testimony was given at defendant's initial trial in which he faced identical charges and the identical potential punishment. Crappa's testimony, which was elicited under oath and subjected to extensive cross-examination by the defense, thus bore the requisite indicia of reliability. We therefore conclude that defendant's constitutional right of confrontation was not abridged when the trial court permitted transcripts of Crappa's prior testimony to be read to the jury.

### C. *Other evidentiary rulings*

Defendant contends the trial court committed prejudicial error in excluding or curtailing the testimony of several witnesses. In defendant's view, the trial court's rulings violated his constitutional rights to due process of law, to present a defense, and to confront adverse witnesses. We address each of defendant's contentions in turn.

### 1. *Dr. London*

Defendant contends the trial court erred in excluding the testimony of Dr. Ray London, a psychologist who was prepared to testify as part of defendant's case-in-chief that law enforcement personnel hypnotized Dana Crappa

---

[20]At oral argument, defense counsel sought to distinguish *Owens* by characterizing Crappa's memory loss as reflecting an asserted "psychological" or "pathological" condition (rather than simply a failure of memory), and urging that this "condition" denied defendant the opportunity to "meaningful[ly]" confront her. Thus, according to defense counsel, had Crappa simply been unable to recall relevant information, for reasons unrelated to trauma, the introduction of her prior testimony would not have violated the confrontation clause. We do not view this distinction as well founded. Neither *Owens* nor *Green* adopts such a constrained interpretation of the confrontation clause, and we likewise decline to do so.

without her knowledge on several occasions prior to and during defendant's first trial. Additionally, London was prepared to testify that police investigators used other sophisticated psychological techniques, short of hypnosis, for the purpose of manipulating and contaminating Crappa's memory.

Defendant offered London's testimony in an effort to persuade the trial court to strike Crappa's testimony or, in the alternative, for the purpose of impeaching her testimony before the jury. Specifically, the defense proposed that in the event the trial court declined to strike Crappa's testimony, the jury should be allowed to hear London's testimony and to *specially find* whether or not Crappa had been hypnotized. Under the proposal advanced by defendant, in the event the jury affirmatively found Crappa to have been hypnotized, it would have been required, pursuant to instructions necessitated by this court's decisions in *Shirley* and *Guerra*, to disregard her testimony.

At the foundational hearing held outside the presence of the jury, London testified he had reviewed the transcripts and tape recordings of Crappa's pretrial interviews with the police, but had not observed Crappa or the purported hypnotic sessions. He opined that Crappa's interviewers had used clandestine hypnotic techniques which had placed her in "an altered state of consciousness" in which she was vulnerable to investigators' suggestions, and that the investigators had contaminated her memory. He further accused law enforcement personnel of lying or being "gravely mistaken" in stating they had not hypnotized Crappa.

In response, the prosecution introduced testimony from Huntington Beach Police Investigator Arthur Droz and Orange County Deputy District Attorney R. Richard Farnell, the law enforcement personnel who had questioned Crappa. The witnesses testified they never had hypnotized Crappa, never had attempted to do so, and had not heard from any source that anyone had hypnotized her.

The trial court weighed the prosecution witnesses' testimony against that of London, concluding that defendant had failed to meet his burden of establishing as a preliminary fact that Crappa had been hypnotized. The court therefore refused to strike Crappa's testimony. In addition, the trial court, pursuant to Evidence Code section 352, refused to admit London's testimony, finding this evidence highly speculative and likely to confuse the jury.

On appeal, defendant does not contend the evidence is insufficient to support the trial court's finding that Crappa had not been hypnotized. Instead, defendant contends that, despite the trial court's finding with regard

to this preliminary fact, the court erred in precluding defendant from presenting London's testimony to the jury. Defendant contends that this evidence was admissible on either of two theories: (1) that he was entitled to have the jury make its own determination whether Crappa had been hypnotized; and (2) that, in any event, London's testimony should have been admitted to impeach Crappa's testimony.

a. *The trial court properly excluded London's testimony related to the alleged hypnosis of Crappa*

■ Defendant contends the jury was entitled to decide *whether* Crappa had been hypnotized. If such hypnosis had been conducted in order to refresh Crappa's memory, our decisions in *Shirley*, *Guerra*, and *Hayes*, discussed above, would have compelled the trial court to exclude the portion of her testimony that had not previously been recalled and recounted to other persons prior to hypnosis. (See *ante*, pp. 770-773.)

We reject defendant's contention that the jury was entitled to make its own determination whether Crappa had been hypnotized and thus to decide whether Crappa's testimony should be excluded. The trial court correctly viewed London's testimony as raising a question of law—the admissibility of evidence pertaining to Crappa's competence, an issue which fell within the exclusive province of the court—rather than a question of fact for the jury's determination. (See Evid. Code, § 310, subd. (a); *People v. Lipinski* (1976) 65 Cal.App.3d 566, 575 [135 Cal.Rptr. 451].) When the existence of a preliminary fact is disputed, it is for the court, not the jury, to determine the existence or nonexistence of the preliminary fact. (Evid. Code, §§ 402, subd. (a), 405, subd. (a); see also *People v. Manson, supra*, 61 Cal.App.3d 102, 136 [trial court vested with the responsibility of determining competence].) We find no error in the trial court's ruling.

b. *The trial court was not obligated to admit London's testimony for impeachment purposes*

Having decided the preliminary fact that Crappa had not been hypnotized, the trial court was not required to grant defendant's request that this issue be submitted for redetermination by the jury. (Evid. Code, §§ 403, subd. (a), 350.) ■ There remains, however, the question whether the trial court properly excluded that portion of London's proffered testimony which addressed the allegedly suggestive nature of the interrogation methods employed by the police.

At defendant's first trial, the defense sought to establish that police investigators had "confabulated" Crappa's testimony—that is, supplanted

Crappa's actual memory with false and imaginary information. (*Alcala I, supra*, 36 Cal.3d at pp. 620-621; *People* v. *Shirley, supra*, 31 Cal.3d at pp. 31, 63-64.) At that trial, the parties' experts "gave conflicting views on whether the tapes [of police interviews with Crappa] suggested that Crappa had been 'brainwashed' or otherwise led, while in a suggestible state, to false memories." (*Alcala I, supra*, 36 Cal.3d at pp. 620-621.) Defendant contends that at the retrial, the trial court should have allowed him to present similar expert testimony regarding improper police interrogation methods in an attempt to impeach the testimony of Crappa and the police investigators.

The testimony which the defense proposed to elicit from London at the retrial was based on his review of Crappa's testimony at defendant's first trial, and of her tape-recorded interviews with police investigators. The trial court, in ruling on the admissibility of the evidence proffered by the defense, assumed that if London were allowed to testify, the prosecution would attempt to introduce additional expert testimony in response, a scenario that the trial court feared could continue "ad infinitum." The trial court also found that the basis for any opinion expressed by London, which did not include any observation of the participants in the Crappa interviews, was insufficient and thus would render his opinion "so highly speculative" that it was unlikely to satisfy the requirements of Evidence Code section 801. Ultimately, the trial court excluded London's testimony pursuant to Evidence Code sections 352 and 402, ruling in part that the testimony "would confound, screw up, do nothing for this case as far as either side getting a fair trial."

Even if we assume that London's proffered testimony (regarding police investigation techniques short of hypnosis) satisfied the requirements of Evidence Code sections 402 and 801, the trial court properly exercised its discretion under Evidence Code section 352 in excluding this testimony. In addition to the judicial policy discussed earlier (*ante*, pp. 781-782), the trial court's concern with avoiding undue consumption of time justifies the exclusion of London's testimony—that concern mirroring, as it does, our observation in *Shirley* that testimony pertaining to the presence or absence of interrogation "safeguards" is likely to inject "undue delay and confusion into the judicial process" and lead to "parades of expert witnesses." (*People* v. *Shirley, supra*, 31 Cal.3d at pp. 39-40.) The jury was read the testimony given by Crappa at the initial trial, and it heard the audiotapes of her lengthy pretrial interviews with the police.[21] Although London was prepared to testify that police investigators had employed improper interrogation techniques while interviewing Crappa, he had not attended those sessions, a

---

[21]In response to the introduction of Crappa's prior testimony, the defense played the audio tape recordings of the interviews considered by London. The jury received transcripts of these interviews, prepared by the defense, in order to assist the jurors in evaluating the interviews

circumstance that lessened the probative value of the opinion he would render. (See *id.*, at pp. 63-64 [unduly suggestive interrogations may include "hypnotist's demeanor and other nonverbal conduct"].) The reliability of his testimony was suspect. Thus, it was within the trial court's discretion to conclude that London's testimony would have been speculative and unduly time-consuming. (Compare *People* v. *McDonald* (1984) 37 Cal.3d 351, 375-377 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011] [trial court erred in excluding expert testimony regarding psychological factors affecting eyewitness identification, where the identification was *not* substantially corroborated by evidence giving it independent reliability].)

Moreover, the exclusion of London's testimony did not prevent the defense from suggesting to the jury that Crappa's testimony was suspect or unreliable. As noted earlier, the "intense" cross-examination of Crappa at defendant's first trial—admitted before the jury at defendant's second trial under the prior-testimony exception to the hearsay rule—included "much sparring about whether her evasive responses to police questioning, and at the preliminary hearing, were outright lies." (*Alcala I, supra,* 36 Cal.3d at p. 620, fn. 5.) At defendant's second trial, the defense was not precluded from urging the jury to find that the nature of the police questioning of Crappa rendered her responses untrustworthy; defense counsel in fact went to great lengths in his closing argument to suggest that the police had contaminated Crappa's testimony.[22]

In view of the foregoing, we conclude that the trial court did not err in excluding London's testimony as not sufficiently probative to outweigh the probability its admission would necessitate undue consumption of time, confuse the issues, or mislead the jury. (Evid. Code, § 352.)

---

while the recordings were being played. These transcripts have been included in the record on appeal. We also have reviewed the taped interviews of Dana Crappa played at defendant's second trial.

[22]Defense counsel argued: "Now, Dana Crappa changed her story quite a bit. . . . [¶] If she really saw [what she testified to], if it wasn't really suggested to her by the people who were interviewing her, and you all heard those taped conversation [*sic*], I'm not going to try to interpret them for you, except to say that it's fairly obvious that there was a lot of something going on there . . . . [¶] You know that [Dana Crappa] was a firefighter. You know that she was a student that was studying police science. [¶] Do you think there's any possibility that she might want to try and become a witness in a case where they don't have a witness at the crime scene? Do you think she might have tried to work that up? [¶] Do you think she might have allowed herself to be convinced to become that witness and testify in trial under oath, and then realize after that that she committed perjury? . . . [¶] What did they tell Dana Crappa[?] Remember what she said on one of the tapes. 'They told me he's 100 percent guilty.' " (Defense counsel apparently was referring to one of the police interviews of Crappa conducted prior to defendant's first trial, and played for the jury, in which Crappa said, ". . . [O]ne of the guys investigating the case, I talked to him before, and he said that he's a hundred percent sure this guy is guilty, a hundred percent without any doubt.")

## 2. *Tim Fallen*

■ Defendant contends he was denied his rights to due process of law, and to present a defense, by the trial court's ruling excluding the offered testimony of Tim Fallen, who purportedly observed Robin Samsoe on June 21, 1979, the day after her disappearance. When defendant called Fallen as a witness, the prosecution requested that the court conduct a hearing outside the presence of the jury, pursuant to Evidence Code section 402, with regard to the admissibility of Fallen's testimony. According to defendant's offer of proof at the hearing, on June 21 a Huntington Beach detective showed Fallen a photograph of Robin, and Fallen told the officer he had seen the girl riding a yellow bicycle earlier that day. Defendant contends Fallen's testimony put the date of Robin's disappearance in dispute, undercut the kidnapping special circumstance, and suggested someone else had killed Robin.

In response, the prosecution argued that although on direct examination at defendant's first trial, Fallen positively identified a photograph of Robin as the girl he had seen on June 21, on cross-examination Fallen had been shown a photograph of a different girl and also had identified that girl, unequivocally, as the person he had seen on June 21. (*Alcala I, supra,* 36 Cal.3d at p. 619.) The prosecution maintained that Fallen's testimony should be excluded as irrelevant in view of his inconsistent testimony at the prior trial.

The trial court accepted the prosecution's argument and excluded the testimony given by Fallen at the prior trial on the ground of relevancy and pursuant to Evidence Code section 352. Relying upon the language of that statute, the court stated that Fallen's positive misidentification of the other girl destroyed whatever probative value his testimony might have had, and that allowing such testimony only would "confuse the issues."

We conclude that the trial court erred in excluding this evidence. Although the court was vested with wide discretion in determining the relevance and weighing the prejudicial effect of proffered evidence against its probative value (*People* v. *Edwards* (1991) 54 Cal.3d 787, 817 [1 Cal.Rptr.2d 696, 819 P.2d 436]), the circumstance that Fallen's testimony readily was subject to impeachment did not afford the court a legitimate basis for excluding this evidence. Eyewitness testimony may be vulnerable to impeachment for numerous reasons, including the possible existence of prior, conflicting testimony; such vulnerability, however, does not render the evidence irrelevant or unduly prejudicial. Under the circumstances of this case, we conclude that defendant was entitled to present Fallen's eyewitness observation (reported to a police officer within one day of Robin's disappearance) that Fallen had observed a girl matching Robin's description,

riding a bicycle of the same color as the one she had borrowed. We thus hold it was error for the trial court to exclude this evidence, either on the ground of relevancy or under the provisions of Evidence Code section 352.

Nevertheless, we conclude that the trial court's error was not prejudicial. The prosecution knew of Fallen's prior testimony and was prepared to impeach him. Had Fallen taken the stand, the jury would have learned that he had given contradictory testimony at defendant's first trial. (Evid. Code, § 780, subd. (h).) The jury necessarily also would have had to contrast Fallen's contradictory testimony with the uncontradicted recollection of Robin's friend, Bridget Wilvert, who testified that Robin had borrowed the bicycle in order to reach her ballet class, and not (as defense counsel suggested at oral argument) in order to "run away" from home, thereby creating an opportunity for Fallen to see her riding the bicycle one day after her disappearance.[23] Under these circumstances, Fallen's testimony would have had very little probative value. In view of the strength of the prosecution's case, we conclude that it is not reasonably probable the jury would have reached a result more favorable to defendant had Fallen testified, and that the trial court's error in excluding this testimony was harmless. (See *People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

### 3. *Gerald Crawford and Raul Vasquez*

Defendant contends the trial court committed reversible error in excluding the proposed testimony of Gerald Crawford and Raul Vasquez, who testified at defendant's first trial. (*Alcala I, supra,* 36 Cal.3d at p. 619.) Defendant's offer of proof was that Crawford, a police officer with the Sierra Madre Police Department, would testify that at 11 p.m. on June 22, 1979, two days after Robin's disappearance, he observed Vasquez acting suspiciously in the general area of the crime scene. Vasquez would testify he was in the area in

---

[23]In pertinent part, Bridget Wilvert testified as follows in response to the prosecutor's questions:

"Q: . . . On the afternoon of June 20th, 1979, had you and Robin discussed her ballet class?
"A: Yes, we did.
"Q: What did she tell you about it?
"A: It was really important for her to be there. She was real excited. She was moving up.
"Q: What do you mean by that?
"A: Moving up, advancing. Moving up into toe shoe.
"Q: Do you know what time it was when Robin left your house . . . with your bike?
"A: It was about 10 after 3:00.
"Q: Did she say anything about why she had to go at that point?
"A: To make it to her house to get her stuff to make it to ballet class on time.
"Q: Was she worried about being on time already?
"A: Very much."

the late evening of June 22 in order to meet someone. Vasquez was on parole from a previous murder conviction, which the prosecutor characterized as a dissimilar, gang-related incident committed years earlier.

The prosecution challenged the relevancy of the proffered testimony, also arguing that even if the trial court found the testimony to be relevant, it was inadmissible under a line of cases following the decision in *People* v. *Arline* (1970) 13 Cal.App.3d 200 [91 Cal.Rptr. 520]. *Arline* applied an elevated standard of relevancy to third party culpability evidence offered by a criminal defendant, requiring " 'competent and substantial proof of a probability' " that the third party committed the crime. (*People* v. *Arline, supra,* 13 Cal.App.3d at pp. 204-205.) In the present case, the trial court found the proffered testimony lacked probative value and therefore excluded it.

Shortly after defendant's offer of proof was rejected by the trial court, we disapproved *Arline* (and its progeny) in *People* v. *Hall* (1986) 41 Cal.3d 826, 831-834 [226 Cal.Rptr. 112, 718 P.2d 99]. We held in *Hall* that third party culpability evidence should be treated by the courts like any other evidence: "if relevant it is admissible ([Evid. Code] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion. ([Evid. Code] § 352.)" (*Id.* at p. 834; see also *People* v. *Kaurish* (1990) 52 Cal.3d 648, 684-686 [276 Cal.Rptr. 788, 802 P.2d 278] [a third party's anger toward the victim held to be an insufficient basis for requiring the trial court to admit evidence linking him to perpetration of the crime].)

▇▇▇▇ On appeal, defendant contends the testimony of Crawford and Vasquez was relevant when viewed in conjunction with Tim Fallen's excluded testimony that he saw a girl resembling Robin on the day following Robin's disappearance. Defendant further contends the trial court erred in applying the heightened *Arline* standard to exclude this testimony.

We discern no error. The record is unclear whether the trial court did, in fact, apply the *Arline* standard in excluding the evidence in question. In any event, we conclude that defendant's offer of proof was insufficient to justify admission of this testimony even under the more lenient standard we announced in *Hall.* The mere presence of Vasquez in the general vicinity of Robin's remains two days after her disappearance was not enough to connect him to Robin's kidnapping and murder. *Hall* explicitly reaffirmed that "evidence of [a third party's] mere motive or opportunity to commit the crime . . . without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People* v. *Hall, supra,* 41 Cal.3d at p. 833; see also *People* v. *Clark, supra,* 3 Cal.4th at pp. 131-133.)

Defendant's offer of proof failed to include any evidence, direct or circumstantial, linking Vasquez to Robin's murder. For example, no offer was made that there was blood on Vasquez's person, a significant omission in view of Dana Crappa's testimony that the torso of the little girl's body had been "pretty cut up," and in view of other prosecution testimony regarding the recovery of a knife bearing human blood, a few feet from Robin's remains, and the recovery of Robin's bloodstained beach towel. Rather, defendant sought to link the proffered testimony to that of Fallen, in order to suggest that Robin was alive on June 21, and perhaps even on June 22, and that Vasquez, not defendant, was responsible for her death. Fallen's testimony, however, did not establish (or even suggest) direct involvement by Vasquez in Robin's murder. The evidence that Vasquez was on parole at the time similarly did not link Vasquez to Robin's murder.

Accordingly, we conclude that the trial court properly excluded the third party culpability evidence proffered by defendant. (See also *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1017-1018 [254 Cal.Rptr. 586, 766 P.2d 1] [third party's possible motive held insufficient to create reasonable doubt].)

Defendant further contends the trial court's evidentiary ruling invaded the province of the jury, denying defendant his right to a jury trial, and impairing his ability to present a defense. We have rejected similar challenges in the past and see no reason to reconsider those decisions. (See *People* v. *Farmer* (1989) 47 Cal.3d 888, 921 [254 Cal.Rptr. 508, 765 P.2d 940]; *People* v. *Hall, supra,* 41 Cal.3d at pp. 834-835.)

### 4. *Jackelyn Young*

Defendant contends the trial court improperly curtailed the cross-examination of prosecution witness Jackelyn Young regarding her inability to identify defendant in a photo lineup on June 27, 1979, one week after she saw defendant, Bridget Wilvert, and Robin on the cliffs at Huntington Beach. The record does not support defendant's contention. At trial, Young identified defendant as the man she observed photographing Bridget and Robin on June 20, 1979. On cross-examination, Young recalled the June 27 photo lineup, but stated in response to repeated questioning from defense counsel that she did not remember being unable to identify defendant. After defense counsel asked Young repeatedly whether she recalled being unable to identify defendant in the photo lineup, the trial court sustained the prosecution's objection to continuation of that line of inquiry, the court finding that the witness had no recollection.

The trial court's curtailment of the cross-examination was appropriate in order to protect the witness from undue harassment, in view of the repeated

questions permitted on this subject. (Evid. Code, § 765, subd. (a).) We find no abuse of discretion.

Nor in any event do we find any possibility of prejudice to the defendant from the trial court's ruling. The court indicated the defense was not precluded from calling the police officer present at the photo lineup to testify regarding Young's responses. Keith Nale, a detective with the Huntington Beach Police Department, subsequently testified during the defense case that on June 27, 1979, Young was shown a photo lineup containing defendant's photograph and was unable to identify any of the subjects as the man she saw on the cliffs with Bridget and Robin. Nale's testimony was uncontradicted. Thus, the defense succeeded in demonstrating what it had been unable to elicit from Young during cross-examination—that Young had identified defendant at trial, but not at the photo lineup one week after Robin's disappearance.

### 5. *Toni Esparza*[24]

■ Defendant contends the trial court improperly curtailed the cross-examination of Toni Esparza regarding her inability to recall the description of defendant's automobile that she provided to the police in July 1979. The record fails to support defendant's contention. On direct examination, Esparza testified that defendant, in an automobile, approached her and her friend, Joanne Murchland, in a parking lot near the Huntington Beach pier on June 19, 1979. On cross-examination, Esparza was unable to describe the vehicle, except to recall that it "wasn't a big car." She indicated twice during cross-examination that she did not recall the description she provided to the police in 1979. Although defense counsel showed her the police report containing the description she provided in June 1979, the report failed to refresh her recollection.[25] When defense counsel subsequently asked her again to testify as to what she told the police in 1979, the trial court interrupted, stating that because Esparza had testified she did not recall what she had told the police, and the report did not refresh her recollection, the cross-examination should proceed to a different topic.

---

[24]Toni Esparza married shortly before defendant's trial in 1986. Her name at trial was Toni McNeal. For the sake of consistency, we shall refer to her by her name at the time of the relevant events in 1979.

[25]When questioned whether she recalled the police officer asking her to describe the vehicle, Esparza responded: "I don't remember, but reading that, I gather he did. I don't remember what I said. Now I don't, but reading that [police report], that's what I said at the time." Defendant contends that Esparza's response "implied recollection" and that cross-examination should have been allowed to proceed under the prior-inconsistent-statement and past-recollection-recorded exceptions to the hearsay rule. (Evid. Code, §§ 1235, 1237.) We disagree with defendant's characterization of Esparza's testimony.

Because this question had been asked and answered, we find no error in the trial court's ruling. We also observe that the court's ruling was not prejudicial to the defense. The description of the automobile given to the police by Esparza was admitted in defendant's case-in-chief through the testimony of the interviewing officer, Ron Jenkins of the Huntington Beach Police Department. Jenkins testified Esparza described the vehicle as "an older[,] bigger car that was full of things." Thus, the jury heard the inconsistency between the descriptions Esparza offered to the police in 1979, and at trial in 1986.

### 6. *Joanne Murchland*

■ Defendant contends the trial court improperly curtailed the cross-examination of Joanne Murchland regarding her inability to recall the description of the automobile in which she observed defendant on June 19, 1979. Murchland testified she had no specific recollection of the vehicle. On cross-examination, defense counsel asked her to read the July 1979 police report for the purpose of refreshing her recollection. Reading the report failed to do so. The trial court sustained the prosecution's objection to further inquiry, in view of Murchland's lack of recollection and the failure of the report to refresh her recollection. The trial court's ruling was correct.

In any event, the ruling was not prejudicial to the defense. Officer Jenkins subsequently testified that Murchland had described the automobile in 1979 as an "older[,] red car." The Datsun F10 impounded at defendant's residence was blue. Thus, the jury was apprised of Murchland's prior identification.

### 7. *Elizabeth Kelleher[26]*

■ Defendant contends the trial court improperly sustained the prosecution's hearsay objections to questions directed to Elizabeth Kelleher on cross-examination regarding statements by defendant as to his plans in May 1979 to sell his property and leave the Los Angeles area. Suggesting that Kelleher's testimony would have demonstrated that defendant had a motive to leave the area before Robin's murder in June 1979, defendant argues her testimony was admissible under the state-of-mind exception to the hearsay rule, codified in section 1250 of the Evidence Code.[27]

The issue is not properly before us, because defendant failed to present that particular theory of admissibility to the trial court. (Evid. Code, § 354,

---

[26]Elizabeth Kelleher married before defendant's trial. Her name at trial was Elizabeth Moore.

[27]Evidence Code section 1250, subdivision (a)(1), creates an exception to the hearsay rule applicable when "[t]he evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action[.]"

subd. (a); *People* v. *Livaditis* (1992) 2 Cal.4th 759, 777-780 [9 Cal.Rptr.2d 72, 831 P.2d 297]; *People* v. *Whitt* (1990) 51 Cal.3d 620, 648 [274 Cal.Rptr. 252, 798 P.2d 849].) Furthermore, even if the issue had been properly preserved, the trial court's curtailment of cross-examination clearly was nonprejudicial inasmuch as defendant's plans already were before the jury through Kelleher's testimony (on direct examination by the prosecution) that in the spring of 1979 she and defendant "had talked . . . about not being too serious, because he was not going to be around for long . . ." and through defendant's introduction of newspaper advertisements (during cross-examination of Kelleher) indicating he had attempted to sell his personal property in April and May of 1979. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

### D. *Admission of the Kane Kut knife sets*

Defendant contends the trial court committed reversible error by admitting into evidence, over defendant's objection, two complete sets of Kane Kut knives seized by the police from the residence defendant shared with his mother. The carving knife which law enforcement officers found near Robin's remains was also a Kane Kut knife. Neither set of knives seized from defendant's residence included a carving knife.

As noted earlier, Dana Crappa testified that the little girl's remains she had seen were "pretty cut up." The carving knife found nearby bore a small amount of human blood. Robin's beach towel was stained with blood in a pattern indicating that someone had wiped a bloody, straight-edged instrument, such as a knife, on the towel. These circumstances strongly suggest that the Kane Kut carving knife found near Robin's remains was involved in Robin's death, and the admission of that knife clearly was proper.

At the evidentiary hearing conducted outside the presence of the jury, Clella Schneider, a Kane Kutlery employee, testified that the carving knife was one of 4,000 to 5,000 which Kane Kutlery distributed in 6 western states, including California, between 1973 and 1977. The carving knife was sold separately from the knife sets. During the same period, Kane Kutlery distributed 15,000 knife sets of the type found in defendant's residence. Defendant's mother testified that the knife sets seized by the police from the residence she shared with defendant were among the gifts provided by her husband's employer at Christmas parties. She did not recognize the carving knife.

Defendant unsuccessfully urged the trial court to exclude the knife sets as irrelevant. ■■■ On appeal, defendant reiterates his challenge to the admission of this evidence. He contends that because a common manufacturer

was the only element connecting the cutlery, the seized sets were irrelevant and unduly prejudicial under Evidence Code sections 350 and 352, and that admission of the knife sets improperly invited the jury to speculate that defendant must have been connected to the carving knife found near Robin's remains.

Section 210 of the Evidence Code defines as "relevant" such evidence as has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Under this broad definition, the trial court properly could determine that despite the relatively weak probative value of the knife sets, they might have some tendency to prove that defendant had access to, or familiarity with, the particular brand of carving knife found near the crime scene. Accordingly, we uphold the trial court's determination that the knife sets were relevant and therefore admissible. (Evid. Code, §§ 210, 350.)

Similarly, we discern no error in the trial court's exercise of discretion under section 352 of the Evidence Code. At the evidentiary hearing, the trial court weighed the probative value of the knife sets against the danger that their admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. The trial court noted that, in view of the difference in appearance between the carving knife and the complete knife sets, the jury could not possibly be misled into believing that the carving knife had been removed from either of the sets of knives. Subsequently, but prior to the trial court's final ruling on the admissibility of this evidence, the testimony of the Kane Kutlery representative established that the carving knife was not part of either of the knife sets seized from defendant's residence. Thus, although the probative value of the knife sets was weak, the danger of confusion, speculation, or prejudice was minimal. We find no abuse of discretion.

Furthermore, we conclude that even if it had been error for the trial court to admit the knife sets, it is not reasonably probable, in light of the other evidence connecting defendant to the murder scene and to the victim, that a result more favorable to defendant would have been reached had this physical evidence been excluded. Thus, any error would be nonprejudicial. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.) In this regard, we reject defendant's contention that the trial court's admission of the knife sets, if erroneous, was prejudicial per se. The early cases which defendant cites in support of this contention, *People* v. *Hill* (1899) 123 Cal. 571 [56 P. 443], *People* v. *McCall* (1935) 10 Cal.App.2d 503 [52 P.2d 500], *People* v. *Mullen* (1924) 69 Cal.App. 548, 551 [231 P. 588], *People* v. *Smith* (1921) 55 Cal.App. 324, 331-334 [203 P. 816], and *People* v. *Muhly* (1909) 11

Cal.App. 129, 135-136 [104 P. 466], fail to reflect the change in the prejudicial-error standard now embodied in article VI, section 13 of the California Constitution. (See *People* v. *Watson, supra,* 46 Cal.2d at pp. 834-838.)

### E. *The trial court's exercise of discretion under Evidence Code section 352 throughout the proceedings*

 Defendant contends the trial court consistently and inappropriately exercised its discretion under Evidence Code section 352 throughout the guilt phase in a manner favorable to the prosecution. To illustrate his point, defendant contrasts the admission of the Kane Kut knife sets and the testimony of Dana Crappa with the exclusion of the testimony of Tim Fallen, Gerald Crawford, Raul Vasquez, and Dr. London. In defendant's view, the trial court employed a "double standard" that denied defendant his constitutional rights to due process of law and equal protection of the laws.

As discussed above, the trial court did not abuse its discretion in its rulings under section 352, except when the court excluded Tim Fallen's testimony. (See, *ante,* at pp. 790-791.)[28] That the bulk of the discretionary rulings were unfavorable to the defense does not signify application of a double standard by the trial court. Defendant's argument is without merit.

### F. *Search of the Seattle storage locker*

Defendant contends the trial court committed reversible error in denying his motion to suppress evidence obtained from a police search of the Seattle, Washington storage locker. Specifically, defendant asserts that the gold ball earrings (which Robin's mother testified were similar to those worn by Robin when she disappeared), the photographs of Lorraine Werts, and Werts's testimony at trial were the fruit of an unlawful search of defendant's residence, during which the police found the Seattle storage locker receipt. Defendant's suppression motion at the second trial renewed without further argument a motion (identical to an unsuccessful motion that preceded the first trial) to suppress all tangible evidence seized from his residence.

At the suppression hearing, defendant's mother, Anna Maria German, testified that she told the police officers when they arrived to search the residence: "You are welcome to search the whole house. We have nothing to

---

[28]The trial court's errors in allowing Bridget Wilvert to testify that defendant had touched Robin's leg, and in allowing Lorraine Werts to identify the date she was photographed and relate defendant's invitation to lunch and his request for her address, were not committed pursuant to Evidence Code section 352, but instead were erroneous under *Shirley, supra,* 31 Cal.3d 18, and its progeny.

hide." The evidence is conflicting whether her statement was made before, or after, Craig Robison, the Huntington Beach detective who supervised the search, informed her that he possessed a search warrant. The conflict is insignificant. The warrant authorized a search for (among other items) photographs, negatives, any kitchen knife similar to the knife found at the murder scene, clothing which Robin was last seen wearing, and Bridget Wilvert's 10-speed bicycle.[29] The warrant also included a standard clause authorizing a search for "[a]ny articles of personal property tending to establish the identity of persons in control of the premises, . . . including but not limited to . . . rent receipts, cancelled mail envelopes, and keys."

█ On appeal, defendant contends that although the search was conducted pursuant to a warrant, the police were not justified in *reading* a storage receipt found inside a book located in his bedroom nightstand. As explained below, we reject this contention.

The flaw in defendant's challenge lies in the particularized nature of the search warrant, which, as noted, authorized the police to search for photographs, negatives, and rent receipts. The challenge also ignores common sense: law enforcement officers would be unable to conduct a search for a rental receipt were they prohibited from reading papers found during the course of an authorized search. We recently upheld a similar search authorized by warrant, in which police officers, searching for papers tending to show the identity of the occupants of the premises, discovered incriminating writings contained in a manila folder found on a desk in the defendant's apartment. (*People* v. *Nicolaus* (1991) 54 Cal.3d 551, 574-575 [286 Cal.Rptr. 628, 817 P.2d 893].) Just as a "rent receipt . . . might reasonably be expected to be found in a folder on a desk" (*id.*, at p. 575), such a receipt easily could be concealed in a variety of other locations, such as a book placed inside a nightstand. The police therefore were entitled to look inside the book and to read the information contained on the storage-locker receipt. (See also *People* v. *Clark, supra,* 3 Cal.4th at pp. 142-143 [opening of defendant's wallet and reading of papers within it did not exceed the scope of a proper booking search]; *People* v. *Hovey, supra,* 44 Cal.3d 543, 570-571 [same].)

Defendant also challenges the search on a related ground—that the warrant provision authorizing a search for rent receipts was contained in a

---

[29]The missing bicycle never was recovered. The former manager of an El Monte charity thrift store that was situated between the murder site and defendant's residence testified that around the end of June or early July, 1979, he found a bicycle outside the store. He concluded the bicycle was a donation, although he noted it was in better condition than one would expect of a donated bicycle, and subsequently resold it to an unknown third party. The bicycle was a yellow Schwinn 10-speed with the handlebars turned up.

"boilerplate" clause which authorized a search for proof of *residency*. Thus, according to defendant, the police were not entitled to rely on that clause in locating a receipt for an *off-premises* storage locker.

Defendant's contention is without merit. As explained, the police discovered the storage locker receipt while they were engaged in a lawful search authorized by the warrant, and the resulting observation of the information disclosed by that receipt clearly was proper. (See, e.g., *Horton* v. *California* (1990) 496 U.S. 128, 133-142 [110 L.Ed.2d 112, 120-127, 110 S.Ct. 2301].) Because observation of the receipt was lawful, law enforcement officials properly could rely on that information in subsequently seeking and obtaining search warrants from a Washington magistrate to search the Seattle storage locker in July 1979. (See, e.g., *People* v. *Roberts* (1956) 47 Cal.2d 374, 377-380 [303 P.2d 721]; *People* v. *Superior Court* (*Moore*) (1980) 104 Cal.App.3d 1001, 1006, 1008-1010 [163 Cal.Rptr. 906].)

Accordingly, the seizure from the storage locker of the earrings and the Werts photographs pursuant to the Washington warrants, and the obtaining of Werts's testimony, were not tainted by prior illegal conduct of the authorities. The trial court properly denied defendant's motion to suppress.[30]

### G. *Cumulative impact of alleged evidentiary errors*

Defendant contends the cumulative impact of the foregoing alleged evidentiary errors requires reversal. We reject this contention. As we have explained, the trial court's evidentiary rulings for the most part were correct. Although we have found that the trial court did err in a few respects— specifically with regard to the testimony of Tim Fallen and portions of the testimony offered by Bridget Wilvert and Lorraine Werts—these rulings, even when viewed cumulatively, did not result in prejudicial error.

### H. *The kidnapping special circumstance*

Defendant contends the trial court committed reversible error in instructing the jury that kidnapping in violation of section 207 was sufficient

---

[30]In light of the foregoing discussion, we reject defendant's arguments that the information that led the police to Seattle was the product of unlawful monitoring of a jailhouse conversation between defendant and his sister, and that defense counsel's failure to object to the police officer's observation of the storage locker receipt constituted ineffective assistance of counsel requiring reversal. In our view, these arguments are totally without merit.

Because we uphold the validity of the police search of defendant's residence based upon the warrant, we need not and do not reach defendant's alternate contention that his mother's consent to search "the whole house" was invalid with respect to the nightstand in defendant's bedroom.

to support a finding of the special circumstance of murder in the course of a kidnapping. Defendant argues that former section 190.2, in enumerating the various underlying offenses whose commission renders a defendant convicted of first degree murder eligible for the punishment of death or confinement in state prison for life without the possibility of parole, required that the kidnapping violate *both* section 207 (simple kidnapping) *and* section 209 (aggravated kidnapping).[31] We repeatedly have rejected identical claims. (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1256 [278 Cal.Rptr. 640 [805 P.2d 899]; *People* v. *Guzman* (1988) 45 Cal.3d 915, 953-954 [248 Cal.Rptr. 467, 755 P.2d 917], *People* v. *Bigelow* (1984) 37 Cal.3d 731, 755-756 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723].)

Defendant, urging that we reconsider the analysis we adopted in *Guzman* and *Bigelow*, asserts that our interpretation of section 190.2, subdivision (a)(17)(ii), renders the statute impermissibly vague and therefore violative of his due process and equal protection rights. Defendant argues the statute failed to afford him notice that a murder committed in the course of a kidnapping under either section 207 or section 209 would render him eligible for the death penalty. He also contends the interpretation of the statute we adopted in *Bigelow* creates an ex post facto law and a denial of due process of law. We find these contentions to be without merit. As we explained in *Bigelow*, " 'The more reasonable statutory construction is that either form of kidnap suffices for invocation of the extreme penalty.' " (37 Cal.3d at p. 755.)

Defendant further contends the California electorate abrogated our holding in *Bigelow*, *supra*, 37 Cal.3d 731, by adopting Proposition 114 on June 5, 1990. That initiative, which proposed to reenact the language of section 190.2, subdivision (a)(17)(ii), received a greater number of affirmative votes than did its companion measure, Proposition 115, which codified the *Bigelow* construction of section 190.2, subdivision (a)(17)(ii), by changing the conjunction between the numerical designations of the two kidnapping statutes from "and" to "or." Based on the principle that where two measures approved at the same election contain conflicting provisions, "those of the

---

[31]In pertinent part, section 190.2 provided at the time of the offense:

"(a) The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been [found to be true]:

" . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(17) The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies:

" . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(ii) Kidnapping in violation of Sections 207 and 209."

measure receiving the highest affirmative vote shall prevail" (Cal. Const., art. II, § 10, subd. (b)), defendant argues that *Bigelow*'s construction of section 190.2, subdivision (a)(17)(ii), no longer is the law.

In light of our recent decision in *Yoshisato* v. *Superior Court* (1992) 2 Cal.4th 978 [9 Cal.Rptr.2d 102, 831 P.2d 327], defendant's contention clearly lacks merit. In *Yoshisato*, we concluded that "Proposition 114 did not create a 'comprehensive scheme' that prevails over all other changes made to section 190.2 by Proposition 115" (*id.* at p. 990), and determined instead that "each amendment enacted by Proposition 115 must be given effect so long as the amendment does not conflict with any amendment made to the same provision by Proposition 114, and so long as the amendment is severable from any other provision of Proposition 115 that cannot be given effect." (*Id.*, at p. 991.) With regard to the specific subdivision of section 190.2 at issue here, we explained in *Yoshisato* that "the various modifications and amendments made by Proposition 115 to paragraph (17) of section 190.2, subdivision (a) . . . are . . . effective." (2 Cal.4th at p. 991.) Therefore, the version of section 190.2, subdivision (a)(17)(ii), currently effective is the one enacted by Proposition 115—a version that explicitly codifies the *Bigelow* decision (*supra*, 37 Cal.3d 731) on this point.

I. *Failure to instruct sua sponte*

Defendant contends the trial court committed reversible error in failing to instruct the jury, sua sponte, regarding: (1) identity (CALJIC No. 2.91)[32] and eyewitness identification factors (CALJIC No. 2.92); (2) defendant's alibi (CALJIC No. 4.50); and (3) the reliability of "jailhouse informant" Frederick Williams. Defendant did not request instructions on any of these matters but asserts the trial court had a duty to provide the jury with such instructions in light of the testimony of the numerous witnesses who linked him to the Huntington Beach area, or to Robin, on June 19-20, 1979. Defendant also contends his counsel's failure to request certain instructions constituted ineffective assistance of counsel. For the reasons set forth below, we reject each of defendant's contentions.

1. *Identity (CALJIC No. 2.91) and eyewitness identification factors (CALJIC No. 2.92)*

Defendant contends the pivotal nature of eyewitness testimony in this case imposed a duty on the trial court to instruct the jury sua sponte pursuant to CALJIC Nos. 2.91 and 2.92. We rejected a similar argument in

---

[32]All CALJIC references are to California Jury Instructions, Criminal (4th ed.), unless otherwise noted.

*People* v. *Blair* (1979) 25 Cal.3d 640, 662-663 [159 Cal.Rptr. 818, 602 P.2d 738]. In *Blair*, the defendant argued that due to the "unreliability of the identification evidence and the importance of that evidence," the trial court should have instructed the jury on its own motion, either pursuant to CALJIC No. 2.91 or the more elaborate instructions set forth in *People* v. *Guzman* (1975) 47 Cal.App.3d 380, 386-387, footnote 1 [121 Cal.Rptr. 69]. (25 Cal.3d at p. 663.) The *Guzman* instructions, viewed together, are similar to CALJIC No. 2.92. (*People* v. *Sanchez* (1990) 221 Cal.App.3d 74, 76 [270 Cal.Rptr. 275].) In declining to accept the defendant's argument in *Blair*, we adopted the view set forth in *People* v. *Richardson* (1978) 83 Cal.App.3d 853, 860-862 [148 Cal.Rptr. 120], that the trial court had no such duty because, inter alia, the court's "general instructions on credibility and burden of proof were sufficient to inform the jury of the test they should apply to the identification evidence." (*People* v. *Blair, supra*, 25 Cal.3d at p. 663.)

In the instant case, as in *Blair* (*supra*, 25 Cal.3d at 663 fn. 22), the trial court admonished the jury pursuant to such general instructions. The court instructed the jury regarding witness credibility (CALJIC No. 2.20), discrepancies in testimony (CALJIC No. 2.21), the weighing of conflicting testimony (CALJIC No. 2.22), the sufficiency of testimony from one witness (CALJIC No. 2.27), and reasonable doubt (CALJIC No. 2.90), also furnishing other instructions involving the evaluation of testimony. Although the trial court did not instruct on alibi (CALJIC No. 4.50) as the court did in *Blair* (*supra*, 25 Cal.3d at p. 663), that distinction is immaterial, because in each case the trial court's instructions clearly addressed the defendant's challenge to the reliability of the testimony which identified him. Moreover, as in *Blair, supra*, there was substantial corroborating evidence in the present case connecting defendant to the crime, apart from the eyewitness testimony. The trial court's instructions were sufficient to inform the jury that the prosecution had the burden of establishing identity, and that defendant should be acquitted in the event the jury harbored a reasonable doubt on the issue of identity. (See also *People* v. *Wright* (1988) 45 Cal.3d 1126, 1144 [248 Cal.Rptr. 600, 755 P.2d 1049] ["CALJIC No. 2.92 or a comparable instruction should be given *when requested* in a case in which identification is a crucial issue and there is *no* substantial corroborative evidence." (Italics added.)]; *People* v. *Sanchez, supra*, 221 Cal.App.3d at pp. 76-78 [relying on *Blair* in holding that a trial court is under no duty to deliver CALJIC No. 2.92 sua sponte]; CALJIC No. 2.92, 5th ed., Comment [no sua sponte duty to instruct].)

2. *Alibi (CALJIC No. 4.50)*

Defendant contends his alibi defense imposed a duty upon the trial court to instruct the jury sua sponte pursuant to CALJIC No. 4.50. We

repeatedly have rejected the identical contention. (See *People* v. *Freeman* (1978) 22 Cal.3d 434, 437-439 [149 Cal.Rptr. 396, 584 P.2d 533], and cases cited therein.) For the purpose of instructing with respect to an alibi defense, it is sufficient that the jury be instructed generally to consider all the evidence, and to acquit the defendant in the event it entertains a reasonable doubt regarding his or her guilt. (*Id.*, at p. 438.) Because the jury was so instructed in the present case (see *ante*, p. 803), defendant's contention lacks merit.[33]

### 3. *Reliability of jailhouse informant*

■ Defendant contends the testimony of inmate Frederick Williams imposed a duty on the trial court to instruct the jury sua sponte to view with distrust the testimony of a jailhouse informant. We repeatedly have rejected the identical contention. (See *People* v. *Pensinger, supra,* 52 Cal.3d at p. 1250, fn. 13, and cases cited therein.) Defendant invites this court to reconsider the issue in light of *United States* v. *Garcia* (5th Cir. 1976) 528 F.2d 580 [reversal where the conviction was based entirely on the informer's uncorroborated testimony]. Such reconsideration is unwarranted. Not only did our decision in *People* v. *Hovey, supra,* 44 Cal.3d at pages 565-566, implicitly reject *Garcia,* but *Garcia* also is factually distinguishable from the instant case. Moreover, at defendant's trial the court instructed the jury pursuant to CALJIC No. 2.23, regarding the credibility of a convicted felon.[34] The trial court thus adequately instructed the jury regarding Williams's testimony.

### 4. *Ineffective assistance of counsel*

Defendant contends he was denied effective assistance of counsel by his attorneys' failure to request that the jury be instructed pursuant to CALJIC Nos. 2.91, 2.92 and 4.50. In light of our determination that the instructions

---

[33]In reviewing proposed jury instructions with counsel outside the presence of the jury, the trial court twice inquired specifically whether defendant sought instruction pursuant to CALJIC No. 4.50, and on each occasion received a negative response from defense counsel. Because we conclude that the giving of such an instruction was not required sua sponte, we have no occasion to determine whether defendant's contention would, in any event, be barred under the invited-error doctrine.

[34]CALJIC No. 2.23 provided: "The fact that a witness had been convicted of a felony, if such be a fact, may be considered by you only for the purpose of determining the credibility of that witness. The fact of such a conviction does not necessarily destroy or impair the witness'[s] credibility. It is one of the circumstances that you may take into consideration in weighing the testimony of such a witness."

Subsequent to the present trial, the Legislature enacted section 1127a, subdivision (b), prescribing that upon the request of a party, the trial court shall give a somewhat more detailed instruction regarding the testimony of an "in-custody informant." That statute is inapplicable here.

given adequately apprised the jury of all relevant legal principles, any failure by counsel clearly was not prejudicial.

### J. *Defendant's waiver of his right to testify*

Defendant did not testify at the guilt phase of his trial. Nor did he inform the court, prior to the conclusion of the guilt phase of the trial, that he sought the opportunity to testify on his own behalf. Following his conviction, defendant sought removal of his counsel pursuant to *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]. In support of defendant's motion, he alleged, inter alia, that his attorneys had failed to advise him adequately regarding the relative benefits and disadvantages of a decision not to testify. Defendant asserted that this failure effectively prevented him from exercising his right to testify in his own defense.

The trial court denied defendant's *Marsden* motion, as well as defendant's concurrent motion for mistrial submitted on the same grounds, observing: (1) defendant's failure to testify involved defense "tactics and strategies"; (2) defense counsel performed within acceptable standards and the defendant received a fair trial; and (3) defense counsel were prepared to provide "a vigorous and proper defense in the penalty phase and to relieve [defense counsel] at this time would be an error. . . ."[35]

On appeal, defendant contends he was improperly prevented from testifying, although there is no evidence in the record supporting this assertion. Defendant therefore invites us to adopt a rule requiring that trial courts obtain an affirmative waiver on the record whenever a defendant fails to testify at trial, and reversing any conviction obtained in the absence of such a waiver. In previous decisions, we have rejected similar proposals. (See *People* v. *Hendricks* (1987) 43 Cal.3d 584, 592-594 [238 Cal.Rptr. 66, 737 P.2d 1350]; *People* v. *Murphy* (1972) 8 Cal.3d 349, 366-367 [105 Cal.Rptr. 138, 503 P.2d 594]; see also *People* v. *Cox* (1991) 53 Cal.3d 618, 671 [280 Cal.Rptr. 692, 809 P.2d 351] [" '[A] trial judge may safely assume that a defendant, who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy; otherwise, the judge would have to conduct a law seminar prior to every criminal trial.' " (Quoting *People* v. *Mosqueda* (1970) 5 Cal.App.3d 540, 545 [85 Cal.Rptr. 346])].) When the record fails to disclose a timely and adequate demand to testify, "a defendant

---

[35]The trial court recognized defendant's postverdict challenge to the defense strategy as an issue addressing the effectiveness of his counsel. The prosecutor observed that defendant's proper recourse was to file a petition for writ of habeas corpus. In February 1989, while the present appeal was pending in this court, defendant filed a petition alleging ineffective assistance of counsel. On September 30, 1992, we denied that petition on the merits.

may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to counsel his desire to testify, he was deprived of that opportunity." (*People* v. *Hayes* (1991) 229 Cal.App.3d 1226, 1231-1232 [280 Cal.Rptr. 578]; *People* v. *Guillen* (1974) 37 Cal.App.3d 976, 984-985 [113 Cal.Rptr. 43].)

Defendant's citation to our decision in *People* v. *Bonin* (1989) 47 Cal.3d 808, 833-843 [254 Cal.Rptr. 298, 765 P.2d 460], in support of a requirement for an affirmative waiver, is misplaced. In *Bonin*, we held the trial court erred in permitting the substitution of counsel who had a conflict of interest, without the court first obtaining a personal, on-the-record waiver from the defendant. (*Id.*, at pp. 838-839.) Nothing in the present case indicates defense counsel had a conflict of interest. Thus, defendant's right to conflict-free representation was not implicated. (Compare *Wood* v. *Georgia* (1981) 450 U.S. 261, 271 [67 L.Ed.2d 220, 230, 101 S.Ct. 1097].)

## II. ISSUES RELATED TO THE PENALTY PHASE

### A. *Excusal of jurors opposed to the death penalty*

■ Defendant contends the trial court committed reversible error in excusing for cause four potential jurors who expressed their inability to impose the death penalty under any circumstances. The jurors properly were excluded. (See *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; *Adams* v. *Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 589-590, 100 S.Ct. 2521]; *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522-523, fn. 21 [20 L.Ed.2d 776, 784-786, 88 S.Ct. 1770]; *People* v. *Mickey* (1991) 54 Cal.3d 612, 679-681 [286 Cal.Rptr. 801, 818 P.2d 84]; *People* v. *Cooper* (1991) 53 Cal.3d 771, 808-809 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Howard* (1988) 44 Cal.3d 375, 415-418 [243 Cal.Rptr. 842, 749 P.2d 279].)

### B. *Evidence relating to other capital cases*

■ Defendant challenges the trial court's denial of his personal request, not joined in by counsel, to present evidence that innocent persons in other cases have been convicted of capital offenses. Defendant's argument fails to recognize that an attorney representing a criminal defendant has the authority to control the presentation of the defense, except that such authority may not be exercised to deprive a defendant of certain fundamental rights, such as the right to testify in one's own behalf. (*People* v. *Robles* (1970) 2 Cal.3d 205, 214-215 [85 Cal.Rptr. 166, 466 P.2d 710].) Defendant's argument is without merit for an additional reason—and would have to be rejected even

if the request to present such evidence had come from his attorney—because a capital defendant has no right to demand jury consideration of such evidence at the penalty phase. The jury's focus at that proceeding must be directed to *the defendant's* character and prior record, and the circumstances of the charged offense. (*Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 172-175 [101 L.Ed.2d 155, 164-167, 108 S.Ct. 2320]; see also *Lockett* v. *Ohio* (1978) 438 U.S. 586, 605, fn. 12 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954] [upholding the trial court's traditional authority to exclude, as irrelevant, evidence not bearing on the defendant's character or prior record, or the circumstances of the offense].) Evidence of third persons' having been wrongfully convicted of capital offenses is irrelevant to the jury's function in the case before them and is therefore inadmissible. (See Evid. Code, § 350; *People* v. *Malone* (1988) 47 Cal.3d 1, 56-57, fn. 31 [252 Cal.Rptr. 525, 762 P.2d 1249] [individualized nature of jury's sentencing determination renders inappropriate the consideration of sentences imposed in similar cases]; *People* v. *Dyer* (1988) 45 Cal.3d 26, 69-71 [246 Cal.Rptr. 209, 753 P.2d 1] [upholding the trial court's rejection of the defendant's attempt to introduce evidence of lesser sentences imposed on codefendants].)

The trial court's exclusion of such improper evidence did not prevent defendant from introducing relevant evidence regarding the circumstances of Robin's death, in an attempt to create a lingering doubt. Indeed, defendant's own testimony at the penalty phase, denying the commission of any offense against Robin, attempted to create such a doubt. Defendant also presented testimony which sought to undermine the prosection's theory regarding the gold ball earrings found in the Seattle storage locker.

Moreover, the jury in the present case was instructed at the penalty phase to "consider all of the evidence which has been received during any part of the trial of this case." The jury was further instructed pursuant to a "catch-all" mitigation instruction derived from section 190.3, factor (k), allowing the jury to consider the following: "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any other aspect of the defendant's character, record, background or emotional makeup, which is offered as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You are not limited as to the matters which you may consider as the basis for a sentence less than death and you may consider pity or sympathy for the defendant as one of those factors. You may, in addition, take into consideration the possibility or probability, if you should so determine, that the defendant has in the past and will in the future successfully adjust to life in prison in such manner as to make a worthwhile contribution thereto." These instructions were sufficient to advise the jury of the full range of mitigating evidence.

(*People* v. *Sully* (1991) 53 Cal.3d 1195, 1244-1245 [283 Cal.Rptr. 144, 812 P.2d 163]; *People* v. *Howard, supra,* 44 Cal.3d at p. 434.)

### C. *Aggravating and mitigating circumstances*

■ Defendant contends the trial court committed reversible error in failing to instruct the jury that it could impose the death penalty only if it found the aggravating circumstances "so substantial in comparison with the mitigating circumstances that it warrants death instead of life [in state prison] without parole."

In the present case, the trial court instructed the jury: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant. [¶] After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere technical counting of factors on each side of an imaginary scale. You are free to assign whatever weight you deem appropriate to each and all of the various factors upon which you have been instructed. By weighing the various circumstances you must determine which penalty is justified." This instruction was not erroneous. (See *People* v. *Melton* (1988) 44 Cal.3d 713, 761 [244 Cal.Rptr. 867, 750 P.2d 741] [upholding an instruction that allowed the jury to assign any weight to each factor]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203-1206 [240 Cal.Rptr. 666, 743 P.2d 301] [upholding an instruction stating that if the jury found the aggravating circumstances to outweigh the mitigating circumstances, the jury "may" (rather than "shall") impose the death penalty].)

### D. *Cruel and unusual punishment*

■ Defendant contends imposition of the death penalty in this case constitutes cruel and unusual punishment in violation of his rights under the Eighth Amendment to the United States Constitution because his conviction rests in part on circumstantial evidence. This argument is without merit. (*People* v. *Siripongs* (1988) 45 Cal.3d 548, 556 [247 Cal.Rptr. 729, 754 P.2d 1306].)

### E. *Miscellaneous contentions*

Defendant submits six claims of constitutional error that he acknowledges have been recently rejected by this court. They are:

(1) that the court erred in failing to instruct the jury that it could not impose the death penalty unless the jury unanimously agreed, beyond a reasonable doubt, that the aggravating circumstances outweighed the mitigating circumstances, and in failing to instruct that the jury could not impose the death penalty unless it agreed, beyond a reasonable doubt, that death was appropriate (*People* v. *Clark, supra,* 3 Cal.4th at p. 170; *People* v. *Heishman* (1988) 45 Cal.3d 147, 189 [246 Cal.Rptr. 673, 753 P.2d 629]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 143 [246 Cal.Rptr. 245, 753 P.2d 37]);

(2) that the court erred in admitting evidence of defendant's alleged commission of offenses (against Julie J.) that had not resulted in a conviction (*People* v. *Price, supra,* 1 Cal.4th at p. 490);

(3) that the court erred in failing to instruct the jury, sua sponte, on the elements of the unadjudicated offenses, and in failing to instruct that they must agree unanimously that defendant committed each unadjudicated offense before considering those offenses in aggravation (*People* v. *Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127]);

(4) that the court erred in admitting evidence regarding defendant's other crimes that *had* resulted in conviction, and that were subject to proof by judgment of conviction (*People* v. *Melton, supra,* 44 Cal.3d at p. 754; *People* v. *Gates, supra,* 43 Cal.3d at p. 1203);

(5) that the 1978 death penalty statute is unconstitutional on its face and as applied, due to its lack of procedural safeguards (*People* v. *Sully, supra,* 53 Cal.3d at pp. 1251-1252; see also *Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]); and

(6) that the death penalty is arbitrary, discriminatory, and disproportionate in light of the facts of this case and defendant's personal characteristics (*People* v. *Edwards, supra,* 54 Cal.3d at pp. 848-849; *People* v. *Melton, supra,* 44 Cal.3d at pp. 771-772).

We adhere to our previous decisions, observing that the latter contention—the purported disproportionality in imposing the death penalty on this particular defendant—invites additional comment. The defense's penalty-phase evidence suggesting the appropriateness of mercy was less

than compelling: prison guards testified that defendant was a good clerk and a cooperative inmate, and defendant's mother testified that he had been a good boy. The defense also called other witnesses in an attempt to cast lingering doubt upon the incident involving Julie J. and upon a pretrial statement, made by Robin's mother to a Huntington Beach detective, Richard Butcher, that she had purchased locally the earrings worn by Robin. In contrast, the evidence in support of a death sentence comprised a haunting montage. Tali S., Julie J., Monique H., and Robin Samsoe were young girls, three of whom were on their way to class, when defendant coaxed them into his automobile. Their average age was 12 years. After encountering each of the first three girls, defendant sought a further young victim, and, after committing his offenses in the present case, he planned, as he had accomplished before, a flight from justice. Defendant's acts of extreme cruelty toward children culminated in his abduction and murder of Robin Samsoe while he awaited trial for the offenses which he had committed against Monique H. The overwhelming weight of the evidence presented at the penalty phase established that defendant had a lengthy history of preying upon children—individuals particularly vulnerable to defendant's subterfuge. In view of these circumstances, there is absolutely no merit in defendant's argument that his death sentence was arbitrary, discriminatory, and disproportionate. (See *People* v. *Edwards, supra*, 54 Cal.3d 787.)

### F. *Cumulative impact of errors*

Defendant contends the cumulative impact of the errors he has alleged requires reversal or, at a minimum, that the judgment be set aside insofar as it imposes the death penalty. We disagree. Our review of the record persuades us that defendant received a fair and untainted trial. The Constitution requires no more. (*People* v. *Mitcham, supra*, 1 Cal.4th at p. 1082.)

### CONCLUSION

The judgment is affirmed.

Lucas, C. J., Panelli, J., Arabian, J., and Baxter, J., concurred.

**KENNARD, J.**—I concur in the judgment. I disagree, however, with the majority's reasoning and conclusions on two issues.

### I.

The trial court ruled that because prosecution witness Dana Crappa was "unable . . . to testify . . . because of then existing . . . mental illness or

infirmity" (Evid. Code, § 240, subd. (a)(3)), she was "unavailable" to testify and therefore the prosecution could introduce transcripts of her testimony from an earlier trial in this case (Evid. Code, § 1291). In upholding the trial court's ruling, the majority relies solely on Crappa's testimony at a hearing that was held outside the jury's presence to determine whether she should be declared unavailable. (Maj. opn., *ante*, at p. 780.)

In my view, however, Crappa's testimony was insufficient to support the trial court's finding that she was an "unavailable" witness. At the unavailability hearing, Crappa testified she could not remember anything connected with the case. This testimony shows only that Crappa's memory was deficient. Standing alone, this testimony is insufficient to support a conclusion that Crappa suffered from a "mental illness or infirmity" under Evidence Code section 240, subdivision (a)(3).

The trial court, however, also heard testimony from Dr. Anthony Staiti, a psychiatrist at Kaiser Hospital, that he had seen Crappa on three occasions in May and June 1985, a year before the trial. Based on these visits and on reports of another psychiatrist who had examined Crappa, Dr. Staiti developed a "working diagnosis" that Crappa was suffering from "post traumatic stress disorder chronic delayed," a disorder that may cause amnesia. Not surprisingly, in view of her professed loss of memory, Crappa did not explicitly describe to Dr. Staiti what it was that she could not remember. She did tell Dr. Staiti, however, that it involved a murder committed in 1979. That was the year of the killing in this case.

Based on the combined testimony of Crappa and Dr. Staiti, the trial court could reasonably conclude that Crappa was "unavailable" to testify because of a "mental illness or infirmity," and that the prosecution could therefore use her prior recorded testimony against defendant.

## II.

Unlike the majority, I am not convinced that the trial court acted within its discretion in excluding under Evidence Code section 352 the expert testimony of Dr. Ray London, a psychologist, that the tape recordings of the police interviews of prosecution witness Dana Crappa revealed the use of suggestive and manipulative psychological techniques that could have influenced her testimony. (Maj. opn., *ante*, at pp. 787-789.) Here, the trial court ruled that Crappa was an "unavailable" witness because of "mental illness or infirmity" (Evid. Code, § 240, subd. (a)(3)). Moreover, the tape recordings of the police interviews of Crappa show that long before she lost all memory of the events relevant to this case, she had trouble remembering precisely

what she had observed at the murder scene, but that police questioning enabled her to reconstruct those events. Thus, in my view, Dr. London's evidence was pertinent to the jury's evaluation of the believability of Crappa's former recorded testimony that placed defendant at the murder scene.

The trial court's exclusion of Dr. London's testimony did not prejudice defendant, however. The jury had ample opportunity to determine whether the police interviewers had indeed influenced Crappa's testimony: the jury heard the taped interviews, and, in closing argument, defense counsel highlighted specific police comments in those tapes that might have been suggestive.

**MOSK, J.**—I dissent.

When this case was before us after defendant's original trial, I would have affirmed the judgment because there was no "miscarriage of justice" within the meaning of article VI, section 13 of the California Constitution. (*People v. Alcala* (1984) 36 Cal.3d 604, 637 [205 Cal.Rptr. 775, 685 P.2d 1126] (dis. opn. of Mosk, J.).)

Since the matter has returned following retrial, I am compelled to conclude to the contrary. I would reverse the judgment because now there has indeed been a miscarriage of justice. Through several erroneous evidentiary rulings, the trial court improperly disturbed the scales on which guilt or innocence was to be weighed, allowing the People to introduce inadmissible evidence for inculpation and barring defendant from introducing admissible evidence for exculpation. As a result, it denied defendant the fundamental fairness guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution.

In the analysis that follows, I shall focus on the four most significant evidentiary rulings.

I

First—and most egregious—the trial judge, on the People's motion outside the presence of the jury, erroneously allowed the prosecution to introduce into evidence testimony that Dana Crappa had given at defendant's original trial. That testimony was crucial, inasmuch as it alone placed defendant at the scene of the murder and did so by eyewitness observation. But it also contained "material inconsistencies." (*People v. Alcala, supra*, 36 Cal.3d at p. 636.) Moreover, it presented itself as only one of several

accounts Crappa had related, none of which was fully reconcilable with any other. Further, it was given in a highly unusual manner, with "substantial delays between the question and an answer, sometimes running perhaps close to a minute, perhaps even longer." Finally, it originated in questionable interrogation by the police. Indeed, at the first trial "[d]efense and prosecution experts gave conflicting views on whether . . . Crappa had been 'brainwashed' or otherwise led, while in a suggestible state, to false memories." (*People* v. *Alcala, supra*, at pp. 620-621.)

Crappa's prior testimony was obviously hearsay. It constituted "evidence of . . . statement[s] that [were] made other than by a witness while testifying at the hearing and that [were] offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) As hearsay, it was inadmissible. (*Id.*, § 1200, subd. (b).)

The trial judge, however, did not so rule. He determined that Crappa's prior testimony was not inadmissible hearsay because Crappa was assertedly "unavailable as a witness" and defendant was a "party" at his original trial and "had the right and opportunity to cross-examine [her] with an interest and motive similar to that which he ha[d]" on retrial. (Evid. Code, § 1291, subd. (a).) The judge found that Crappa was "unavailable" on the ground that she was allegedly "unable . . . to testify . . . because of then existing . . . mental . . . infirmity." (*Id.*, § 240, subd. (a)(3).)

The trial judge's ruling cannot survive scrutiny. The critical finding of unavailability is invalid. It matters not what standard of review is applied. The reason is plain. The finding is fictive, and not real. The majority miss this dispositive fact. As a result, their analysis fails.

In making the People's motion immediately before Crappa was scheduled to take the stand, the prosecutor represented that "[s]he has . . . told me, in response to my direct question essentially, I have asked her, is it a situation where you can't remember, or you don't want to remember. And essentially it seems to be a situation where she just doesn't want to remember so she is going to say she doesn't remember. But it's not a situation where she can't remember."

The trial judge chose to let the prosecutor's representation go past as though it had never been made. Presumably, he did so because he was disinclined to take whatever "reasonable steps" would have been required "to induce [Crappa] to testify" if he found that she refused to do so. (*People* v. *Sul* (1981) 122 Cal.App.3d 355, 364-365 [175 Cal.Rptr. 893].)

I do not overlook the evidence introduced at the hearing. The People, of course, bore the burden to prove Crappa's unavailability (*People* v. *Stritzinger* (1983) 34 Cal.3d 505, 516 [194 Cal.Rptr. 431, 668 P.2d 738]) by a

preponderance of the evidence (Evid. Code, § 115, 2d par.). The evidence, however, was insufficient.

I shall assume for argument's sake only that this case is not subject to the general rule, which requires "expert testimony on the witness's present condition . . . ." (*People* v. *Stritzinger, supra,* 34 Cal.3d at p. 517.) Nevertheless, I do note that it certainly does not come within the only recognized exception, which covers refusal to testify out of fear. (See *id.* at pp. 518-519, discussing *People* v. *Rojas* (1975) 15 Cal.3d 540, 547-552 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127].)

Be that as it may, there was not sufficient evidence that Crappa was "unable . . . to testify . . . because of *then existing* . . . mental . . . infirmity." (Evid. Code, § 240, subd. (a)(3), italics added.) At best, Crappa and Dr. Anthony Staiti, a psychiatrist she had briefly consulted about a year earlier, made statements that might support an inference that she may have suffered from some "mental infirmity" of some sort in the past. That is all. To be sure, the trial judge stated that Crappa "seemed to wince and blink" under questioning. But he could reasonably have deduced little from such an observation. He may have been an experienced jurist. He was not a diagnostician.

The trial judge was apparently not troubled by the evidentiary void. He declared in the midst of the hearing that "I am never hampered by the law . . . ." Events proved him right. He had determined the course he would follow. He also declared: "Basically, what we are going to do is put [Crappa] on [before the jury], let her have her say-so, give it a shot, and get into the reading [of her prior testimony]." Events proved him right here too.

Indeed, the trial judge apparently sought to maintain the evidentiary void. That is the only reasonable explanation for his decision to deny a motion defendant made for an independent psychiatric examination of Crappa. I recognize that, in refusing the request, he declared that "I don't think [such an examination] would add or detract." Of course he did not. As noted, he had already determined the course he would follow. Earlier, he had stated that he was not "hampered" by the law. Here, he implied that he would not be "hampered" by the facts. The majority find the denial of the motion proper. I disagree. An independent psychiatric examination is indeed appropriate when the asserted "mental infirmity" is only "apparent"—as the majority themselves essentially concede to be the case here. Further, defendant sought the examination in question to determine whether Crappa was in fact suffering from a "mental infirmity," and not to simply to impeach her credibility.

## II

Second—and only slightly less egregious—the trial judge, denying a motion defendant made outside the presence of the jury, erroneously prohibited Dr. Ray William London, a psychologist, from giving any testimony whatsoever on behalf of the defense. "That gentleman," declared the trial judge, "ain't going to testify in this case . . . ." Dr. London's testimony would have included expert opinion to the effect that Crappa had been led to false memories by suggestive police interrogation incorporating sophisticated psychological techniques. At defendant's original trial, testimony of this sort was given. On retrial, Dr. London was a crucial defense witness because Crappa was a crucial prosecution witness.

Dr. London's proposed testimony was plainly admissible.

Manifestly, the testimony was relevant. It had a strong "tendency in reason to . . . disprove [a] disputed fact that [was] of consequence to the determination of the action," specifically, the credibility of Crappa. (Evid. Code, § 210.)

Moreover, the testimony was a proper subject of expert opinion. First, it was "[r]elated to a subject that is sufficiently beyond common experience" as to "assist the trier of fact." (Evid. Code, § 801, subd. (a).) What the record reveals is not "stage hypnotism," with theatrical display by a performer and humorous antics by a member of his audience. Rather, there was suggestive police interrogation incorporating sophisticated psychological techniques— techniques designed not to call attention to themselves. Jurors might be familiar with the former. They would have little acquaintance, however, with the latter. Second, the testimony was "[b]ased on matter . . . perceived by or personally known to the witness or made known to him at or before the hearing, . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (Id., § 801, subd. (b).) Dr. London reviewed materials including transcripts and audio-tape recordings of Crappa's interrogation by the police and transcripts of her prior testimony.

Finally, the testimony's "probative value," which was high, was not "substantially outweighed by the probability that its admission" would "necessitate undue consumption of time" or "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Here too, the trial judge ruled otherwise. He determined that Dr. London's proposed testimony was not a proper subject of expert opinion. He found Dr.

London's opinion too "speculative," essentially because the psychologist had not personally attended the pertinent police interrogation sessions involving Crappa. He also found Dr. London's opinion substantially more prejudicial than probative because it "could give the jury no guidance but confusion," "would confound, screw up, do nothing for this case as far as either side getting a fair trial," and would entail "undue consumption of time."

Here too, the trial judge's ruling fails. More than a year earlier, in *People v. McDonald* (1984) 37 Cal.3d 351, 377 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], we had expressly held: "When"—as here—"an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." This case is no exception. The "judicial policy disfavoring attempts to impeach witnesses by means of psychiatric testimony" (maj. opn., *ante*, at p. 781), invoked by the majority to support the ruling, proves to be inapplicable. It generally opposes challenges to the veracity of a person who testifies. But it does not bar attacks on the accuracy of his testimony.

Contrary to the majority's view, the trial judge's determination that Dr. London's proposed testimony was substantially more prejudicial than probative is unsound. At the hearing on the motion, he was able to prevent any confusion or delay that might have been occasioned by the psychologist's opinion. He would surely have been able to do the same before the jury. Without doubt, similar testimony given at defendant's original trial was not "unduly prejudicial" in any way. Dr. London's would have had no untoward effect.

Again contrary to the majority's view, the trial judge's determination that Dr. London's proposed testimony was not a proper subject of expert opinion is unsound as well. Indeed, the judge's finding that the psychologist's opinion was too "speculative" essentially because the psychologist had not personally attended the pertinent police interrogation sessions involving Crappa is practically ludicrous. As stated, Dr. London had reviewed materials including transcripts and audio-tape recordings of Crappa's interrogation by the police and transcripts of her prior testimony. The judge's implication is unsupported: there is simply no requirement that an expert must have personal perception or knowledge of all the matters on which his opinion is based. In any event, any such "requirement" would have to be waived in this case. When Crappa was interrogated by the police, there was no defense

expert; if there had been, he would obviously not have been welcomed. Subsequently, as the prosecutor acknowledged, Crappa refused to talk to the defense: "she always said she wouldn't talk to them . . . ."

## III

Third, the trial judge, again denying a motion defendant made outside the presence of the jury, erroneously prohibited Tim Fallen from giving any testimony whatsoever on behalf of the defense. Fallen would have briefly and simply testified to the effect that he observed Robin Samsoe the day after Crappa assertedly saw the girl and defendant at the scene of the murder near a remote mountain ravine. At defendant's original trial, Fallen had given substantially similar testimony. There, when he was shown a photograph of Samsoe on direct examination by defense counsel, he positively identified the subject as the girl he had seen. But when he was shown a photograph of another girl on cross-examination by the prosecutor, he made the same positive identification. On retrial, Fallen was a crucial defense witness because Crappa was a crucial prosecution witness.

Fallen's proposed testimony was plainly admissible. It was relevant, having as it did a strong tendency to disprove a disputed, material fact, viz., the credibility of Crappa. Further, it was not "unduly prejudicial": if credited, it would point to defendant's innocence; if not credited, it would have no effect.

Again, the trial judge ruled otherwise. He determined in substance that Fallen's proposed testimony was irrelevant because it was "not going to add any probative value." He also determined that, even if it were relevant, it was "unduly prejudicial" because of the "danger of confusing the jury" and the risk of "undue consumption of time."

Again, the trial judge's ruling fails. The majority themselves concede the error. I shall not belabor the point. Suffice it to say that the brief and simple testimony that Fallen would have given on what was manifestly a critical issue was altogether relevant and not at all "unduly prejudicial." That he would have been subject to impeachment because of his positive identification of the two photographs is of no consequence for present purposes. In passing, however, I note that the two girls, as pictured, were not dissimilar in appearance.

## IV

Fourth, the trial judge, yet again denying a motion defendant made outside the presence of the jury, erroneously prohibited Gerald Crawford and Raul

Vasquez from giving any testimony whatsoever on behalf of the defense. Crawford and Vasquez would have testified to the following effect: Crawford was a police officer and Vasquez was a convicted murderer; about 11 p.m., two days after Crappa assertedly saw Samsoe and defendant at the scene of the murder in a remote mountain ravine, Crawford found Vasquez "acting suspiciously" in that very area. At defendant's original trial, Crawford and Vasquez had given substantially similar testimony. On retrial, Crawford and Vasquez were crucial defense witnesses because Crappa was a crucial prosecution witness. They were also crucial defense witnesses in their own right because they offered exculpatory evidence.

The proposed testimony by Crawford and Vasquez was plainly admissible. It was relevant: it had a strong tendency both to prove one disputed, material fact—the innocence of defendant—and to disprove another disputed, material fact—the credibility of Crappa. Further, it was not "unduly prejudicial": if credited, it would point clearly to defendant's innocence; if not credited, it would have no effect.

Yet again, the trial judge ruled otherwise. He determined in substance that the proposed testimony by Crawford and Vasquez was irrelevant because the "probative value of this type of evidence is zero . . . ." He also determined that, even if it were relevant, it was unduly prejudicial because it "would do nothing but confuse the jury . . . ."

Yet again, the trial judge's ruling fails.

In *People* v. *Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99], we held that evidence of third party culpability—like the proposed testimony by Crawford and Vasquez—is admissible if relevant. (*Id.* at p. 834.) Relevance requires "direct or circumstantial evidence linking the third person to the actual perpetration of the crime"; "evidence of mere motive or opportunity . . . , without more, will not suffice . . . ." (*Id.* at p. 833.) The proposed testimony linked Vasquez to the crime itself and went beyond mere motive or opportunity. Vasquez was found near the scene of the murder in a remote mountain ravine; he was there about 11 p.m. on a day not long after the crime was apparently committed; and, significantly, he was "acting suspiciously." The trial judge missed the point entirely. How else to explain his statement that the "probative value of this type of evidence is zero"? For their part, the majority fail to discern the critical importance of Vasquez's suspicious activity.

In *Hall*, we also held that evidence of third party culpability is not excludable unless "unduly prejudicial." (41 Cal.3d at p. 834.) Contrary to the

trial judge's conclusion, there was simply nothing confusing about the proposed testimony.

## V

In sum, through the four erroneous evidentiary rulings discussed above, among others, the trial court improperly disturbed the scales of justice and thereby denied defendant the fundamental fairness guaranteed by the due process clause of the Fourteenth Amendment. It is incomprehensible that the majority can conclude "defendant received a fair and untainted trial" (maj. opn., *ante*, at p. 810) and on that basis send him on his way to death in the gas chamber.

Accordingly, I would reverse the judgment.

Appellant's petition for a rehearing was denied March 10, 1993, and the opinion was modified to read as printed above. Mosk, J., was of the opinion that the petition should be granted.